Linda Margaret SALVESON, Plaintiff-Respondent,

v.

DOUGLAS COUNTY and Wisconsin County Mutual
Insurance Corporation, Defendants-Appellants.†

Court of Appeals

*No. 99–0946. Submitted on briefs January 24, 2000.—Decided
March 28, 2000.*

## 2000 WI App 80

(Also reported in 610 N.W.2d 184.)

†Petition to review granted.

413

On behalf of the defendants-appellants, the cause was submitted on the briefs of *John J. Prentice* and *Andrew T. Phillips* of *Prentice & Phillips*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Kyle H. Torvinen* of *Hendricks, Knudson, Gee, Hayden, Torvinen & Weiby, S.C.*, Superior.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. PETERSON, J.   Douglas County and Wisconsin County Mutual Insurance Corporation (the County) appeal a judgment in favor of Linda Salveson in an employment discrimination and sexual harassment action. The County makes five arguments on appeal: (1) there was insufficient evidence to support the jury's finding that Salveson lost a portion of her earning capacity; (2) the trial court erred by awarding Salveson back pay; (3) the trial court erred by awarding Salveson front pay; (4) the trial court erroneously

417

determined the statutory cap for damages; and (5) the trial court erroneously allowed Salveson to present new evidence on her motion to reconsider. We reverse the award for lost earning capacity because Salveson did not present any evidence establishing the extent of her diminished earning capacity. We reject the County's various other arguments, however.[1]

## BACKGROUND

¶ 2. Salveson worked as a paramedic for the County from 1981 until 1995. She claimed that her supervisor, Richard Collyard, sexually harassed her and subjected her to a hostile work environment under Title VII.[2]

¶ 3. A jury returned a verdict in favor of Salveson finding the County liable for sexual harassment and discrimination. The County does not contest that finding. The jury awarded Salveson $40,000 for lost future earning capacity.[3] The decision to award equitable

---

[1] The net result of our decision is to affirm the judgment because reversing only the award for lost earning capacity does not affect the amount actually awarded in the circuit court judgment. As explained further in our conclusion at ¶ 46, a statutory cap on compensatory damages had already served to reduce the total compensatory damages by more than the amount awarded for lost earning capacity.

[2] Title VII refers to Title VII of the Civil Rights Act of 1964, a federal law that prohibits employment discrimination and harassment. *See* 42 U.S.C. §§ 2000e–2000e(17) (1994). All references to the United States Code refer to the statutes in effect in 1994 unless otherwise indicated.

[3] The jury also awarded Salveson $1,220 for past medical expense, $15,000 for future medical expense, $200,000 for past pain and suffering, and $100,000 for future pain and suffering. The County does not challenge these awards on appeal.

remedies, if any, was left for the trial court to decide. After the jury trial, the trial court awarded equitable remedies of both front and back pay to compensate Salveson for her pecuniary damages.

## EARNING CAPACITY

¶ 4. The County claims that the evidence presented was insufficient to support the jury's finding that Salveson suffered $40,000 in lost earning capacity. In upholding the jury's award on motions after verdict, the trial court relied on the testimony of Salveson's treating psychologist, Dr. Kenneth Pride. The court concluded that Pride's testimony constituted sufficient evidence for the jury to find that Salveson suffered a permanent psychological impairment that "may affect her ability to gain and hold employment in the future."[4]

¶ 5. We sustain a jury's factual determinations if there is any credible evidence to support its verdict. *See Lipinski v. Pakulski*, 62 Wis. 2d 628, 635, 215 N.W.2d 468 (1974). We are even more reluctant to interfere when the trial judge has approved the jury verdict. *See Herman v. Milwaukee Children's Hosp.*, 121 Wis. 2d 531, 545, 361 N.W.2d 297 (Ct. App. 1984).

¶ 6. Damages for impaired earning capacity are arrived at by comparing what the plaintiff was capable

---

[4] Although the County presented expert testimony indicating that Salveson did not suffer any permanent psychological injury, the weight and credibility to be given to the opinions of experts is uniquely within the province of the jury. *See Milbauer v. Transport Employes' Mut. Benefit Soc.*, 56 Wis. 2d 860, 867, 203 N.W.2d 135 (1973). Here, the jury apparently accepted Dr. Pride's version as true.

of earning before and after the time of the injury. *See Ballard v. Lumbermens Mut. Cas. Co.*, 33 Wis. 2d 601, 609–10, 148 N.W.2d 65 (1967). Proof of lost earning capacity is naturally somewhat uncertain. *See Fischer v. Cleveland Punch & Shear Works, Co.*, 91 Wis. 2d 85, 100, 280 N.W.2d 280 (1979). Generally, proof of permanent injury alone is not sufficient to establish lost earning capacity. There is an exception when common knowledge would permit a finding that permanent injury has completely disabled the plaintiff from all work for which she is suited. *See Ianni v. Grain Dealers Mut. Ins. Co.*, 42 Wis. 2d 354, 363, 166 N.W.2d 148 (1969). Absent readily apparent and complete disability, however, an award for lost earning capacity must be supported by evidence indicating the extent of impairment. *See Schulz v. St. Mary's Hosp.*, 81 Wis. 2d 638, 655–59, 260 N.W.2d 783 (1978).

¶ 7.    In *Schulz*, the plaintiff had worked part-time as a typing and shorthand teacher. She testified that after her injury she suffered from fatigue requiring her to take daily naps. *See id.* at 655–56. The plaintiff's treating physician "testified that this fatigue could interfere with her capacity to earn a living." *Id.* at 656. The physician also testified that the plaintiff's injuries would reduce her earning capacity because she would continue to suffer fatigue and face potential difficulties in the future. *See id.* The jury awarded the plaintiff damages for lost earning capacity. The supreme court reversed the award, explaining that the issue raised by the evidence was not whether the plaintiff lost a portion of her earning capacity, but whether there was sufficient "evidence to enable the jury to measure the loss sustained." *Id.* The court stated:

> The process of ascertaining the amount of compensation to be awarded requires (1) the determination of the extent to which such capacity has been diminished, and (2) the fixing of the amount of money which will compensate for the determined extent of impairment.
>
> The extent of the diminution or impairment of earning capacity is generally to be arrived at by comparing what the injured party was capable of earning at or before the time of the injury with what he was capable of earning after it occurred.

*Id.* at 656 (citations omitted). The court termed these the "basic requirements" for an award for lost earning capacity. *See id.* at 657. However, the court concluded that the basic requirements were not satisfied because there was no evidence showing what the plaintiff's previous earning history was or what the salary expectations for similarly situated employees would likely be in the future. *See Id.*

¶ 8. In *Klink v. Cappelli*, 179 Wis. 2d 624, 630, 508 N.W.2d 435 (Ct. App. 1993), the court interpreted *Schulz* as requiring "evidence relating to earning capacity before and after an injury." The court explained that without that showing, the jury would be forced to "speculate or conjecture as to the amount of lost earning capacity." *Id.*

¶ 9. Here, the County claims: (1) there was no evidence Salveson suffered permanent injury, and (2) even if there was, Salveson did not prove how the permanent injury affected her earning capacity. It was undisputed at trial that Salveson currently suffers from post-traumatic stress disorder, depression and anxiety. Further, Salveson's treating psychologist, Dr.

Pride, testified that Salveson is and will continue to be affected by the harassment she received at work. When asked whether the psychological effect would continue for the remainder of Salveson's life, Pride answered that "[t]hese are lifelong issues, yes." We conclude that a jury could reasonably infer from this evidence that Salveson suffered a permanent injury.

¶ 10. We agree with the County, however, that Salveson did not present any evidence that showed what effect her psychological injuries would have on her earning capacity. Although Pride discussed his doubt that Salveson would be capable of normal employment for the next three years, there was no evidence indicating how or to what extent her future jobs would be affected by her psychological injuries.[5] If Pride's testimony were sufficient, the additional evidence requirement would be meaningless. On this record, the jury could only speculate as to the extent that Salveson's psychological injuries could be expected to affect her future earning capacity. *See Klink*, 179 Wis. 2d at 630. Accordingly, we reverse the award of damages for lost earning capacity.

BACK PAY

¶ 11. The trial court awarded Salveson $89,434 in back pay for the period between her last day of work and the jury verdict. This was intended to compensate her for lost wages from the end of her employment until she obtained judgment. Complicating Salveson's damages claim was the fact that while employed by the

[5] Salveson's discussion concerning her lost employment opportunity with the private company that took over the County's ambulance department does not generally address her future opportunities because the only reason she suggested that she was unable to work there was Collyard's presence.

County she also suffered from a number of unrelated physical injuries. Specifically, Salveson injured her knee in December 1993, requiring a light duty assignment. She returned to work in the field in December 1994. Then, in April 1995, she slipped on some ice and hurt her back and was again placed on light duty assignment.

¶ 12. At about that same time, Salveson applied for duty disability benefits under WIS. STAT. ch. 40[6] because her knee difficulties precluded her from working actively in the field as a paramedic. While her application was being considered, in September 1995, she began working in the Douglas County Register of Deeds office. After approximately two months, she retired and began receiving disability benefits. Salveson nevertheless continued to work part-time for the County as a medical examiner. On January 1, 1996, a private ambulance corporation named Gold Cross took over the County's ambulance department.

¶ 13. The County concedes that courts presumptively award back pay whenever employment discrimination occurs. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18 (1975). Nevertheless, the County argues that back pay was not appropriate in this case because: (1) Salveson was unable to work as a paramedic due to unrelated physical injuries, and (2) the award of back pay should have been offset by the amount Salveson received in duty disability benefits. The trial court rejected the first argument because it found that the evidence indicated Salveson "would most likely have been hired by Gold Cross either as an instructor or in some other light capacity." With regard to the second argument, the court concluded that

[6] All statutory references are to the 1997–98 edition.

423

because Salveson contributed to the fund that provided her disability benefits, she earned the benefits and, therefore, the benefits should not be used to offset her back pay.[7]

### 1. Other Injuries

¶ 14. Back pay is an equitable remedy and is awarded at the discretion of the trial court. *See* Title VII, section 706(g) (codified at 42 U.S.C. § 2000e–5(g)). We affirm equitable decisions unless the trial court erroneously exercised its discretion. *See Lueck's Home Improve., Inc. v. Seal Tite Nat'l, Inc.,* 142 Wis. 2d 843, 847, 419 N.W.2d 340 (Ct. App. 1987). Discretionary decisions are sustained if the trial court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982). Additionally, we sustain the trial court's findings of fact unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2).

¶ 15. An award of back pay serves two roles. First, "it provides compensation for the tangible economic loss suffered by those who are discriminated against. Secondly, and even more importantly, because backpay awards act as a deterrent to employers and unions, such awards play a crucial role in the remedial process." *United States v. N. L. Indus., Inc.,* 479 F.2d

---

[7] The court originally concluded that an offset was appropriate. However, the court changed its decision after considering additional affidavits and argument from each party. We address the issue of whether the court properly allowed Salveson to submit new evidence later in the opinion.

354, 379 (8th Cir. 1973) (citations omitted). "It follows that, given a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Ablemarle*, 422 U.S. at 421.

¶ 16. The County contends that because Salveson admitted she was no longer physically capable of working as a field paramedic, "it only seems logical that the trial court should have required [Salveson to] show that her injuries did not preclude her from seeking other gainful employment before awarding backpay." However, we reject the contention that intervening circumstances eliminate the presumption in favor of awarding back pay.[8]

¶ 17. The trial court noted that the evidence supported "the conclusion that [Salveson] was qualified to work as a paramedic with Gold Cross either as a paramedic instructor or in some other limited capacity to accommodate her physical limitations." The court also found that although Gold Cross would have hired Salveson had she applied, it was unreasonable for her to do so because Gold Cross had previously hired Collyard, the person who had harassed Salveson. The record supports the trial court's conclusion that Salveson was entitled to compensation for her lost income.

¶ 18. The County takes issue with this evidence, characterizing it as "unreliable at best" and "self-serving." However, when the trial court acts as the finder of

---

[8] Although other forms of compensation create the possibility of an offset, we address that possibility as a separate issue below.

fact, it is the ultimate and final arbiter of the credibility of witnesses. *See Klein-Dickert Oshkosh, Inc. v. Frontier Mortgage Corp.*, 93 Wis. 2d 660, 663, 287 N.W.2d 742 (1980). These findings were not clearly erroneous and are supported by the evidence.

¶ 19.   Alternatively, the County maintains that the trial court should not have awarded back pay because Salveson has taken inconsistent positions with regard to her ability to work. Salveson has claimed in this case that she could not work because of the harassment. In her duty disability application, she claimed that she could not work because of physical limitations. According to the County, if she is and will continue to be compensated for being physically incapable of working, she should not receive back pay for harassment. However, we are not persuaded that Salveson has been inconsistent. She maintained, and the trial court found, that she would have been capable of working for Gold Cross either as a paramedic instructor or in some other limited capacity that would have accommodated her physical limitations. The Department of Workforce Development's determination that Salveson was physically incapable of working in the field as a paramedic is not inconsistent with her position here that she would have been capable of working in some limited physical capacity. In deference to the presumption in favor of back pay and the trial court's superior position in making equitable determinations, we conclude that the trial court properly exercised its discretion by awarding back pay.

2.   *Offset*

¶ 20.   The County claims that even if the trial court properly awarded back pay, it erroneously exer-

cised its discretion when it refused to offset the award by the amount Salveson received from duty disability benefits.[9] The trial court relied on *EEOC v. O'Grady*, 857 F.2d 383 (7th Cir. 1988), where the county employer argued that the claimants' back pay award should be offset against the amount of pension benefits the claimants received. The employer claimed that it was being forced to pay twice because it contributed directly to the pension plan. The claimants responded that the pension plan was administered by an independent state agency and was therefore collateral.[10] The Seventh Circuit concluded that the district court properly exercised its discretion by refusing to offset. First, the

[9] The County asserts that the appropriate standard of review for addressing this issue is for an erroneous exercise of discretion. Therefore, we do not consider whether a de novo standard of review would be appropriate. *Compare Lussier v. Runyon*, 50 F.3d 1103, 1107–10 (1st Cir. 1995) (concluding that the district court retained discretion to offset such benefits) *with Hamlin v. Charter Township*, 165 F.3d 426, 432 (6th Cir. 1999) ("Because it is a question of legal policy, we review a district court's decision to deduct collateral benefits from a jury discrimination award under a de novo standard.").

[10] The collateral source rule provides "that benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages." 1 DAN B. DOBBS, LAW OF REMEDIES § 3.8(1), at 372–73 (2d 1993); *see also Lambert v. Wrensch*, 135 Wis. 2d 105, 110–11 n.5, 399 N.W.2d 369 (1987). The collateral source rule does not necessarily support the County's implicit argument that the trial court should have offset the back pay award with Salveson's duty disability benefits even if those benefits came directly from the County. *See Flowers v. Komatsu Mining Sys., Inc.*, 165 F.3d 554, 558 (7th Cir. 1999) (In employment cases, the trial court has discretion to offset an award if the employer is the source of the funds at issue.).

court noted that "the pension benefits may be viewed as *earned* by the claimants and therefore not paid by the employer at all." *Id.* at 391. Second, the disability benefits carried out an independent state policy and did not discharge any obligations to the claimants. *See id.*

¶ 21.  The County does not dispute that its employees bargained for the duty disability benefits and that the County made contributions on behalf of the employees. Moreover, the policy reasons for providing benefits for protective occupation participants are independent from the considerations involved in deterring workplace discrimination. The County's contributions do not discharge any duty to maintain a suitable working environment. The County would have had to contribute to the fund regardless. As the *O'Grady* court stated, the employer should not be afforded a "discrimination bonus."[11] *Id.*

## FRONT PAY

¶ 22.  According to the County, the trial court also erroneously exercised its discretion by awarding Salveson front pay. The trial court explained that it was awarding front pay for the immediate effects of the County's discrimination and that reinstating Salveson would be impossible. Explaining that an award of front pay should ordinarily be relatively short, the court found that a one-year award would be appropriate.

¶ 23.  Ordinarily, reinstatement is the preferred remedy to avoid future lost earnings, but reinstate-

---

[11] Because it is not before us, we do not consider whether the State is entitled to recoup any of the disability benefits Salveson received as a result of her back and front pay awards. *See* WIS. STAT. § 40.65(5)(b). If the State is able to recoup some of Salveson's benefits, any windfall would be reduced.

ment may not always be feasible. *See Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1438–49 (11th Cir. 1985). There may be no position available at the time of judgment or the relationship between the parties may have been so damaged by animosity that reinstatement is impracticable. *See Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir. 1984). In these circumstances, the remedial purpose of the statute would be thwarted if front pay were not available as an alternate remedy to reinstatement. *See id.*

¶ 24. The County argues that the trial court should not have awarded front pay because: (1) Salveson did not show that she was unable to obtain comparable employment; (2) the award of front pay was too long; and (3) Salveson's current mental condition is the result of previous traumatic experiences. We reject each of these arguments and conclude that the trial court properly exercised its discretion.

¶ 25. Initially, we note that no position was available and that reinstating Salveson was impossible because a private corporation had taken control of the ambulance department by the time the trial ended. However, the trial court concluded, based primarily on the testimony of a witness from Gold Cross, that Salveson would have been hired at Gold Cross if she had applied. It was impractical for her to apply, however, because Collyard worked there. Although Salveson had been working as a clerk in the register of deeds office, the court explained that Salveson "should not have to work as a clerk when her career has always been as a paramedic."

¶ 26. We reject the County's first argument that Salveson had the burden of proving that there were no comparable job opportunities available to her. The County cites no legal support for its proposition, and it

runs contrary to the policy behind fully compensating a claimant.

¶ 27.  The County's second argument is that the one-year time frame for the front pay award was too lengthy. The trial court recognized that an award of front pay must be limited to what is foreseeable and mitigated. *See Kempfer v. Automated Finishing, Inc.*, 211 Wis. 2d 100, 120, ¶ 30, 564 N.W.2d 692 (1997). The court considered Salveson's need for specialized employment capable of accommodating her physical limitations. Accordingly, we conclude that the court acted well within its discretion by setting a relatively short period of one year for the front pay award.

¶ 28.  Finally, the County contends that Salveson had been treated for post-traumatic stress disorder for unrelated experiences before the County subjected her to a hostile work environment. But Dr. Pride testified that the hostile work environment directly caused Salveson's current condition. The trial court reasonably relied on this testimony in deciding to award front pay.[12]

## COMPENSATORY DAMAGE CAP

¶ 29.  The Civil Rights Act of 1991 added new remedial provisions to Title VII that authorize compensatory damages for a claimant's "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other

---

[12] The County also incorporates its argument that the back pay award should have been offset by the amount Salveson received for duty disability benefits. Because the County does not develop any new argument for front pay, we will not consider the issue further.

nonpecuniary losses . . . ."[13] 42 U.S.C. § 1981a(b)(3). Previously, Title VII only authorized a claimant to seek back pay, reinstatement "or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1).[14] Claimants are now entitled to recover compensatory damages that are "in addition to," and do not replace or duplicate, the remedies previously authorized under Title VII. 42 U.S.C. § 1981a(a)(1). The statute caps the amount of these new damages, requiring that "the amount of compensatory damages awarded under this section . . . shall not exceed [$300,000 for an employer the size of the County]."[15] 42 U.S.C. § 1981a(b)(3)(D).[16] A specific section explicitly excludes previously authorized forms of equitable relief from the compensatory damage cap. *See* 42 U.S.C. § 1981a(b)(2).[17]

[13] 42 U.S.C. § 1981a(b) also specifies that punitive damages are available if the claimant demonstrates that the employer engaged in discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." It also provides that punitive damages are not available against a governmental entity or political subdivision.

[14] *See also Mitchell v. Seaboard Sys. R.R.*, 883 F.2d 451, 452 (6th Cir. 1989) (explaining that, at the time, Title VII plaintiffs were entitled to equitable relief but not to compensatory damages).

[15] The County disputes that its size qualified it for the $300,000 cap. That argument is considered separately below.

[16] For ease of discussion: (1) damages previously authorized under Title VII refer to damages authorized under 42 U.S.C. § 2000e–5(g); (2) new damages authorized by the 1991 Act refers to damages authorized under 42 U.S.C. § 1981a; and (3) the damage cap refers to the compensatory and punitive damage cap under § 1981a(b)(3).

[17] 42 U.S.C. § 1981a(b)(2) provides:

**Exclusions from compensatory damages**

¶ 30.   The County develops two separate arguments regarding the damage cap. First, it claims that the trial court's front pay award of $27,744 should be included in the damage cap because it is a compensatory award newly authorized under the 1991 Act. Because the total award for compensatory damages already exceeds the damage cap, the practical effect of the County's argument would be to eliminate the front pay award. Second, the County contends that the trial court erred in determining the amount of the cap.

*1.   Front Pay*

¶ 31.   The County argues that the front pay award should have been subject to the damage cap because it is a compensatory damage newly authorized under the 1991 Act. This issue presents a question of statutory interpretation. Interpretation of a federal statute is a question of law that this court reviews de novo. *See GMAC Mortgage Corp. v. Gisvold*, 215 Wis. 2d 459, 471 ¶ 20, 572 N.W.2d 466 (1998). We use a two-step process for interpreting statutes:

> The ultimate goal of statutory interpretation is to ascertain the intent of the legislature. The first step of this process is to look at the language of the statute. If the plain meaning of the statute is clear, a court need not look to rules of statutory construction or other extrinsic aids. Instead, a court should simply apply the clear meaning of the statute to the facts before it. If, however, the statute is ambiguous, this court must look beyond the statute's

Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964.

language and examine the scope, history, context, subject matter, and purpose of the statute.

*UFE Inc. v. LIRC*, 201 Wis. 2d 274, 281–82, 548 N.W.2d 57 (1996) (citations omitted).

¶ 32. Our ultimate goal is to determine whether Congress intended front pay to be included in its statutory cap on damages. Our decision turns on whether front pay is characterized as equitable relief that Title VII previously authorized, *see* 42 U.S.C. § 1981a(b)(2), or compensatory damages authorized under the 1991 Act for "future pecuniary losses." 42 U.S.C. § 1981a(b)(3). If Title VII previously authorized front pay as equitable relief, the trial court acted properly because Congress did not intend to include front pay in the damage cap. If, on the other hand, Title VII did not previously authorize front pay, then the award should have been subject to the cap.

¶ 33. The federal circuits are divided on this issue. The Sixth Circuit has held that front pay falls within the damage cap. *See Hudson v. Reno*, 130 F.3d 1193, 1202–04 (6th Cir. 1997). The court determined that the common, ordinary meaning of the term "future pecuniary losses" is "an amount of money which will be lost at a later time." *Id.* at 1203. Accordingly, the court concluded that " 'front pay,' by both its definition and purpose in the law, is a 'future pecuniary loss' because it is a monetary award for the salary that the employee would have received but for the discrimination." *Id.*

¶ 34. The Eight, Ninth, Tenth and District of Columbia Circuit Courts of Appeals, however, have concluded that front pay is an equitable remedy previously authorized under Title VII and not subject to the

433

damage cap.[18] *See Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148, 1154 (9th Cir. 1999); *Martini v. Federal Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1348–49 (D.C. Cir. 1999); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 555 (10th Cir. 1999); *Kramer v. Logan County Sch. Dist. No. R–1*, 157 F.3d 620, 626 (8th Cir. 1998). The Equal Employment Opportunity Commission has reached the same conclusion. *See* EEOC: POLICY GUIDE ON COMPENSATORY AND PUNITIVE DAMAGES UNDER 1991 CIVIL RIGHTS ACT, 8 LAB. REL. REP. FAIR EMPL. PRAC. MANUAL (BNA) 405:7091, 7094 (July 7, 1992). These conflicting interpretations indicate that reasonable minds could disagree as to the statute's meaning, an indication that the statute is ambiguous. *See Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 662, 539 N.W.2d 98 (1995).

¶ 35. We agree with the majority of federal circuits and the EEOC that Congress intended front pay to be excluded from the damage cap. Those authorities have relied on the fact that as early as 1982, the District of Columbia Circuit indicated that front pay was included among the equitable remedies previously

---

[18] Although the Seventh Circuit has not specifically addressed the issue in terms of the damage cap, it recently decided that front pay is appropriately categorized as an equitable remedy previously authorized under Title VII. *See Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir. 1998). The court concluded that "front pay is the functional equivalent of reinstatement because it is a substitute remedy that affords the plaintiff the same benefit (or as close an approximation as possible) as the plaintiff would have received had she been reinstated." *Id.* at 952. As the equivalent of reinstatement, front pay is explicitly authorized under Title VII and "falls squarely within the statutory language authorizing 'any other equitable relief.' " *Id.*

available under Title VII. *See Thompson v. Sawyer*, 678 F.2d 257, 292 (D.C. Cir. 1982). Moreover, from this court's independent research, it appears that before the 1991 Act was adopted, every circuit that addressed the issue had decided that front pay was an equitable remedy authorized under Title VII. *See, e.g., EEOC v. General Lines, Inc.*, 865 F.2d 1555, 1561 (10th Cir.1989); *Sellers v. Delgado Community College*, 839 F.2d 1132, 1141 (5th Cir. 1988). When Congress incorporates a prior law into a new law, it "normally can be presumed to have had knowledge of the interpretation given to the incorporated law" by federal circuit courts. *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978). We consider this line of reasoning more persuasive than the one-circuit majority view.

### 2. *Amount of Damage Cap*

¶ 36.  The County claims that the trial court incorrectly determined the amount of the damage cap. The amount of the cap depends on an employer's size. *See* 42 U.S.C. § 1981a(b)(3). Section 1981a(b)(3) states, in relevant part:

> The sum of the amount of compensatory damages awarded under this section . . . shall not exceed . . .
>
> **(C)**   in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and
>
> **(D)**   in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

The trial court determined the County's size at the time when the harassment occurred.[19] The County claims that its size should have been determined at the time of the verdict. By the trial court's method, the damage cap would be $300,000. By the County's method, the cap would be $200,000.

¶ 37. The County claims that the phrase, "current or preceding calendar year" unambiguously refers to the year compensatory damages are awarded. It urges us to apply the well-established rule of statutory construction that when the statutory language is clear and unambiguous, we implement the legislative intent reflected by that language without recourse to collateral sources. *See State Historical Soc'y v. Maple Bluff,* 112 Wis. 2d 246, 252, 332 N.W.2d 792 (1983).

¶ 38. We are not convinced, however, that the statute clearly and unambiguously indicates that the current calendar year means the year judgment is awarded. The County correctly notes that a determination of the cap amount would not be necessary until judgment is obtained, but that observation does not necessarily lead to the County's interpretation. We

---

[19] Salveson alleged continuous discrimination throughout her employment. It is undisputed that the County had more than 500 employees from the start of the harassment period until 1993, but fewer from 1994 to 1998. The damage cap measures the size of an employer by whether it has the requisite number of employees "in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 1981a(b)(3). The County does not make the specific argument that it is improper to consider each year of the entire discrimination period. Rather, it focuses its argument on the appropriate reference period, arguing that the proper reference for the current calendar year is the year judgment is obtained.

conclude that this language is ambiguous because it is susceptible to conflicting interpretations.

¶ 39.   "While it is true that statutory interpretation begins with the language of the statute, it is also well established that courts must not look at a single, isolated sentence or portion of a sentence, but at the role of the relevant language in the entire statute." *Alberte v. Anew Health Care Servs., Inc.*, 2000 WI 7, ¶ 10, 232 Wis. 2d 587, 605 N.W.2d 515. Title VII applies to employers who have "fifteen or more employees for each working day of each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). In determining whether an employer fits Title VII's employer definition, federal courts have consistently interpreted "the current or preceding calendar year" as the year of discrimination or harassment. *See, e.g., Guadagno v. Wallack Ader Levithan Assoc.*, 932 F. Supp. 94, 96 (S.D.N.Y. 1996). The use of the identical language in 42 U.S.C. § 1981a(b)(3) suggests a similar construction here.

¶ 40.   The County cites no authority to the contrary, but attempts to avoid this conclusion by arguing that employer-definition cases are distinguishable because they discuss an inquiry necessarily undertaken before any award can exist. However, the County's distinction is one without a difference. Differing reference points—the year of the award for determining the damage cap, but the year of discrimination for determining whether a defendant is an employer—make no sense. We construe statutory language to avoid unreasonable and illogical

interpretations.[20] *See, e.g., State v. Moore,* 167 Wis. 2d 491, 496, 481 N.W.2d 633 (1992). Accordingly, the trial court properly determined the County's size by referring to the time of harassment.

## MOTION FOR RECONSIDERATION

¶ 41. Finally, the County argues that the trial court erroneously exercised its discretion by allowing Salveson to present additional evidence after the trial court ruled on her post-verdict motions. The court originally concluded that Salveson's awards of back and front pay should be offset by her duty disability payments. Salveson filed a motion for reconsideration attaching affidavits showing that she contributed in various ways to make those benefits available. The court considered this evidence in reversing its position. The County claims that the trial court did not have authority to receive additional evidence. We disagree.

¶ 42. As previously discussed, the awards of back and front pay are equitable in nature. These issues were not submitted to the jury and therefore Salveson had no duty to present her evidence at trial. Following trial, Salveson sought the equitable awards by motion, and the County raised the issue of offset for the first time in its reply brief. The trial court heard oral argument on the motions but, although the court and parties discussed numerous issues, they did not discuss the issue of offset and neither party introduced evidence. After the court issued its memorandum decision, but before the court entered judgment, Salveson moved the court for reconsideration.

---

[20] We also note that determining the employer's size as of the date of the award has the potential for abuse because an employer could reduce its size intentionally to reduce its exposure.

¶ 43. WISCONSIN STAT. § 805.17(3) provides in part: "[T]he court may amend its findings or conclusions or make additional findings or conclusions and may amend the judgment accordingly." We have previously discussed the broad scope of § 805.17(3) in *Village of Thiensville v. Olsen*, 223 Wis. 2d 256, 262, 588 N.W.2d 394 (Ct. App. 1998):

> A judge's job is to do justice. A judge endeavors to come to the right result. The law gives a judge the right to change his or her mind, so long as it is done in a timely fashion and the parties are given a fair chance to be heard. . . . A judge should not have to live with the consequences of a decision that he or she, upon reflection, believes to be wrong.

A trial court has wide discretion to reconsider an earlier decision, and nothing prevents the court from accepting additional evidence in the interests of justice. We reject the County's argument that the trial court was without authority to receive additional evidence.

¶ 44. We note that the County sought and received an opportunity to present evidence rebutting Salveson's affidavits. At the hearing on Salveson's motion for reconsideration, counsel for the County stated: "I guess my feeling on it is if the court is going to give consideration to these [new] affidavits, I think out of fairness my client ought to have some opportunity to respond to the allegations in those affidavits, some reasonable period of time." The court then gave the County two weeks to submit further evidence supporting its position. The County submitted evidence indicating that it made significant contributions to the Wisconsin Retirement System on behalf of its employees, but that Salveson did not directly contribute a significant

439

amount from her paychecks. The trial court considered this evidence, but reasonably concluded that the County's contributions to the retirement system were in lieu of higher pay for Salveson. Accordingly, the court gave the County the opportunity to submit rebuttal evidence, handled the matter fairly and properly exercised its discretion in reconsidering its original ruling.

CONCLUSION

¶ 45.  While we reverse the award for lost earning capacity, that decision does not affect the circuit court's final judgment. The jury awarded a total of $356,220 that we have concluded constitutes compensatory damages subject to the statutory damage cap. Of that amount, only $40,000 was awarded for lost earning capacity. The statute caps compensatory damages at $300,000 for an employer the size of the County. Eliminating the $40,000 award for lost earning capacity still leaves the net compensatory damage award above $300,000. Therefore, the trial court's judgment capping those damages at $300,000 remains unaffected.

*By the Court.*—Judgment affirmed.