DOBBRATZ TRUCKING & EXCAVATING, INC., Plaintiff-Respondent-Cross-Appellant,

v.

PACCAR, INC. and Kenworth Truck Company, Defendants-Appellants-Cross-Respondents.

Court of Appeals

*No. 01–1091. Submitted on briefs January 11, 2002.—Decided May 9, 2002.*

2002 WI App 138

(Also reported in 647 N.W.2d 315.)

205

On behalf of the defendants-appellants-cross-respondents, the cause was submitted on the briefs of *Frank J. Daily, Mark A. Kircher, Jeffrey O. Davis,* and *Cory L. Nettles* of *Quarles & Brady LLP*, Milwaukee.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the brief of *Lawrence Alan Towers* of *Towers Law Firm*, Brookfield.

Before Dykman, Deininger and Lundsten, JJ.

¶ 1. DYKMAN, J.   Kenworth Truck Company and PACCAR, Inc. (collectively Kenworth) appeal from a judgment awarding damages to Dobbratz Trucking and Excavating, Inc., for a violation of Wisconsin's Lemon Law, WIS. STAT. § 218.015 (1997–98).[1] Kenworth contends that the circuit court erred in refusing to direct a verdict in favor of Kenworth because there was insufficient evidence to support a finding that a warranted defect had substantially impaired the use, value or safety of the dump truck that Dobbratz had purchased from a Kenworth dealer. In addition, Kenworth asserts that the circuit court erroneously exercised its discretion when it granted Dobbratz's motion in limine re-

---

[1] The statute has since been renumbered by 1999 Wis. Act 31, § 287. *See* WIS. STAT. § 218.0171 (1999–2000). All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

questing that Kenworth be barred from introducing evidence at trial that Dobbratz had overloaded the truck.

¶ 2. On cross-appeal, Dobbratz argues that the circuit court erred when it excluded attorney's fees from the "amount recovered" under WIS. STAT. § 807.01(4) for the purpose of awarding prejudgment interest. We disagree with each of these contentions and affirm in all respects.

## Background

¶ 3. In December 1997, Dobbratz Trucking & Excavating, Inc. ordered a 1998 Kenworth T800 Dump Truck from a Kenworth Truck Company dealer. Kenworth built the truck and Dobbratz signed a purchase agreement. Dobbratz purchased and took physical delivery of the truck in May 1998. The truck came with a warranty from Kenworth. It provided in part:

> Kenworth Truck Company warrants directly to you that the Kenworth vehicle identified below, except for engine, engine brake, automatic transmission, tires, wheels, and/or rims, and fifth wheel, which are warranted directly to you by their respective manufacturers, and except for trade accessories, *will be free from defects in materials and workmanship* during the time and mileage periods set forth in the Warranty Schedule and appearing under normal use and service.

(Emphasis added.)

¶ 4. Dobbratz brought the truck in for service at the Kenworth dealer on October 23, 1998, complaining that "the truck turns hard when loaded." Apparently, the truck was not loaded at the time so Dobbratz returned with the truck loaded on October 27, 1998. At this time, Dobbratz complained that "the power steer-

ing will not turn unless you move." The repair order states that the steering "did not act up" in the shop, but when the mechanic took the truck to the gravel lot, he "got [the] steering to bind." The mechanic then called "TRW per Brian" so that he "could help us troubleshoot to why [the truck] wasn't turning." As a result, the mechanic installed a new power steering pump. Dobbratz returned, reporting that the truck still would not stationary steer. The mechanic again called "TRW," who told him to make sure the correct pump had been installed. The repair order states:   "Check pump it has most flow possible. With pusher axles down truck turns fine."

¶ 5.   On November 12, 1998, Dobbratz brought the truck back to the dealer. A mechanic loaded the truck with sand "to simulate the complaint condition." The repair order states:   "We could not find a problem with the truck, steering appeared normal." However, the mechanic testified that, during the simulation, "[i]t took a lot of effort to turn with the axles up." A representative from Kenworth, who was also present at the simulation, testified that "when the pusher axles were up," the wheels of the truck could not be turned.[2] Dobbratz and Kenworth agreed that a TRW representative would test the truck "at a later date."

¶ 6.   On December 1, 1998, Dobbratz again brought the truck to the dealer, this time so that a

---

[2] In its brief, Dobbratz argues that the reason the repair order states that "steering appeared normal" is due to the mechanics' misconception that the truck was overloaded during the simulation. Although the record supports Dobbratz's assertion that the Kenworth representative was misinformed regarding the weight of the load in the truck, Dobbratz does not cite to any portion of the record showing testimony that this misconception explained the repair order.

"TRW troubleshooter," Ronald Brettnacher, could examine the truck. The repair order states that "we took the loaded unit and demonstrated the complaint . . . TRW Rep filed a report to John G. [from Kenworth]." Although Brettnacher testified that he did observe that the truck's stationary steering was "restricted" under certain conditions, he concluded this was "normal" and that the "steering system is performing to capability."

¶ 7.  In addition to reporting problems with stationary steering, Dobbratz also took the dump truck to the dealer on multiple occasions after a light repeatedly came on indicating that there was a problem with the anti-lock braking system. No problems with the braking system were ever discovered.

¶ 8.  On April 27, 1999, Dobbratz sued Kenworth and PACCAR, Inc. (which owns Kenworth), alleging that the defendants had failed to timely repair several nonconformities that were under warranty as they were required to do under the Lemon Law. On August 9, 2000, after receiving Kenworth's supplemental responses to a discovery request, Dobbratz moved in limine for an order prohibiting Kenworth from asserting as a defense that Dobbratz had damaged the truck by overloading it. After a hearing on October 30, 2000, the circuit court granted the motion. Although the court noted that the evidence was "probably" probative, it stated that "much if not all of the discovery would have to be redone" if the defense was allowed. Further, Kenworth had documents with evidence supporting the defense since the Fall of 1999, but failed to inform Dobbratz that it would assert the defense at trial until after the discovery deadline had passed and the trial was initially scheduled to begin. Finally, weighing the probative value of the evidence against "the extremely

significant expense and inconvenience of really starting from scratch," the court concluded that it would grant Dobbratz's motion.

¶ 9.  At trial, a jury found that the truck had a nonconformity with respect to both the stationary power steering and the anti-lock brake system. Kenworth filed a motion to set aside the verdict, or, in the alternative, to grant a new trial, which the court denied. Because Dobbratz made a settlement offer that was rejected by Kenworth and obtained a judgment that was larger than the offer, the court awarded Dobbratz double costs under Wis. Stat. § 807.01(3) and prejudgment interest on the "amount recovered" under § 807.01(4). However, the circuit court excluded Dobbratz's attorney's fees from this amount. Kenworth appeals the judgment in favor of Dobbratz and Dobbratz appeals the circuit court's refusal to award prejudgment interest on attorney fees.

## Decision

### A. Lemon Law Overview

¶ 10.  ·Under Wisconsin's "Lemon Law," manufacturers and dealers are required to repair any motor vehicle "nonconformity" covered under an express warranty. Wis. Stat. § 218.015(2)(a). A "nonconformity" is defined in part as "a condition or defect which substantially impairs the use, value or safety of a motor vehicle." Section 218.015(1)(f). If the same nonconformity has not been repaired after four attempts, or if the vehicle is out of service for at least thirty days, the consumer may elect any one of several remedies, including a refund. Section 218.015(1)(h) and (2)(b). If the manufacturer refuses, the consumer may sue the manufacturer and is entitled to recover twice the

amount of his or her pecuniary loss. Section 218.015(7). In addition, the statute awards the consumer his or her litigation costs and attorney fees. *Id.*

## B. Stationary Steering

### 1. Express Warranty

¶ 11.  Kenworth first argues that, as a matter of law, there was no express warranty that covered Dobbratz's situation. The warranty provided that the dump truck would "be free from defects in materials and workmanship." Kenworth emphasizes that the warranty did not specifically list "stationary steering" as covered under the warranty. However, Kenworth later concedes that the warranty *would* apply to a problem with the steering mechanism if it was caused by a defect in the materials or workmanship of the truck. Further, Kenworth does not dispute that Dobbratz had difficulty with stationary steering the truck. The issue, then, is not whether the warranty covers an ability to stationary steer. Rather, the issue is whether there was sufficient evidence for the jury to conclude that Dobbratz's inability to stationary steer the truck was caused by a defect in the materials or workmanship of the truck. We conclude that there was.

¶ 12.  We will sustain a jury's factual determination if there is any credible evidence supporting its verdict. *Salveson v. Douglas County*, 2000 WI App 80, ¶ 5, 234 Wis. 2d 413, 610 N.W.2d 184, *aff'd*, 2001 WI 100, 245 Wis. 2d 497, 630 N.W.2d 182. Although it is true that neither the dealership mechanics nor Dobbratz's expert were able to pinpoint a specific com-

ponent that was defective, this was not required. We have previously rejected the contention that a Lemon Law plaintiff must identify the exact cause of the vehicle's malfunction before a jury may infer there is a warranty defect. *See Vultaggio v. General Motors Corp.*, 145 Wis. 2d 874, 882–83, 429 N.W.2d 93 (Ct. App. 1988). John Jewell, Dobbratz's mechanical expert who ran tests on the truck, testified that he had "never seen another dump truck not be able to steer when stationary on concrete" and that the truck's steering problems were "consistent with a malfunction." Further, Richard Sedgley, a civil engineer employed by Kenworth, testified that a dump truck with a load of less than 20,000 pounds should be able to stationary steer and that a failure to do so indicates that the truck "doesn't conform to the specification." This was sufficient to permit the jury to conclude that the truck's inability to stationary steer was caused by a defect in materials or workmanship.[3]

2. Substantial Impairment

¶ 13.    Kenworth argues next that Dobbratz failed to prove that the truck's inability to stationary steer when loaded was a "nonconformity" under the Lemon Law, i.e., that it was "a condition or defect which substantially impairs the use, value or safety of a motor vehicle." Wis. Stat. § 218.015(1)(f). Whether a set of facts fulfills a legal standard is a question of law. *Chmill*

---

[3] Because we conclude that the jury could reasonably find that Dobbratz's inability to stationary steer was caused by a warranted defect, we need not consider whether the notation "PWR STRG: dual gears* TRW TAS65 22K" in the "Chassis Pre-Bill" created a specific warranty regarding the steering, as the circuit court concluded.

*v. Friendly Ford-Mercury of Janesville, Inc.*, 144 Wis. 2d 796, 802, 424 N.W.2d 747 (Ct. App. 1988). However, the determination whether a vehicle has a defect that substantially impairs its value, use or safety requires factual findings that are interconnected with a legal conclusion. *Id.* at 803. As a result, we give weight to the fact finder's decision, but not controlling weight. *Id.*; *see also Langreck v. Wisconsin Lawyers Mut. Ins. Co.*, 226 Wis. 2d 520, 524–25, 594 N.W.2d 818 (Ct. App. 1999).

■

¶ 14.   In support of its argument that Dobbratz's truck was not substantially impaired, Kenworth first points to a trial exhibit which shows that "Dobbratz was able to use the truck on an almost daily basis." However, simply because the consumer is able to drive the vehicle does not mean that it is free from non-conformities. *See Chmill*, 144 Wis. 2d at 804; *Vultaggio*, 145 Wis. 2d at 887.

■

¶ 15.   Todd Dobbratz testified at trial that without an ability to stationary steer while loaded, a dump truck cannot maneuver into many tight spots. This is important, Dobbratz explained, because many work sites necessitate being able to fit into a precise location. Dobbratz provided the example of needing to be exactly under the spot where materials will drop into the truck's box, and said that this had been a problem. He further provided several examples of instances where his ability to do his job was substantially impaired and he received complaints on work sites because he was unable to sufficiently maneuver his truck. Jewell agreed that an ability to stationary steer is essential for a dump truck because dump trucks "by their nature"

should be able to "fit into spots that most of us would just as soon not try to squeeze your cars into." Jewell further explained:

> If he can't maneuver the truck or if anyone can't maneuver their dump truck in tight spaces, the equipment operators aren't going to want them there because they're slowing up their what's called a cycle time. When a company bids something, they bid a machine to be able to load a truck in so many seconds and if this truck is taking twice as long just to load it just to back into position, then they're backing up a number of other trucks that are coming in and out on a high production job.

> On a lower production job, such as digging a house basement, a driver could drive over someone's grade stake because he couldn't turn the truck. He may take two or three hours worth of work to the crew to reset the grade stake . . . . It would be very bad to have a truck that you couldn't drive or steer properly when it's off road. Nobody would want you on their site.

¶ 16. Kenworth also relies on testimony of Dobbratz's former boss that his truck's performance was never a reason that Dobbratz was not sent to a job. Even if this is true, we do not agree that it requires the verdict to be overturned. That Dobbratz may have avoided direct financial injury and still attempted to perform his job does not mean that his truck was not substantially impaired. Dobbratz testified, and an expert agreed, that his dump truck was unable to perform a function necessary to complete many jobs adequately. This was sufficient to permit the jury to conclude that the stationary steering defect constituted a nonconformity.

217

¶ 17. Kenworth does not challenge the jury's finding that the same nonconformity existed after the fourth time the vehicle was made available to Kenworth for repairs, so we do not consider that issue. Further, because one nonconformity is sufficient to establish a violation of the Lemon Law, we need not decide Kenworth's contention that the circuit court erred in refusing to direct a verdict with regard to the anti-braking system defect.

## C. Exclusion of Evidence of Abuse

¶ 18. Just before this case was originally scheduled to go to trial, Kenworth provided a discovery response indicating that it was going to assert as a defense at trial that Dobbratz had caused the problems with the truck by overloading it. Kenworth now asserts that the circuit court erred when it granted Dobbratz's motion in limine to exclude that evidence.

¶ 19. In deciding to exclude the evidence, the circuit court concluded that the prejudice to Dobbratz and the delay that admitting the evidence would cause, substantially outweighed the probative value of the evidence. In addition, the court noted that Kenworth filed its supplemental responses after the discovery deadline, in violation of the scheduling order. Thus, two legal standards are implicated: (1) the standard for excluding relevant evidence under Wis. Stat. § 904.03;[4] and (2) the standard for excluding evidence as a sanc-

---

[4] WISCONSIN STAT. § 904.03 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

tion for violating a scheduling order under Wis. Stat. § 802.10.[5] We review a circuit court's decision to exclude evidence for either reason under an erroneous exercise of discretion standard. *See Siker v. Siker*, 225 Wis. 2d 522, 535, 593 N.W.2d 830 (Ct. App. 1999); *State v. Brewer*, 195 Wis. 2d 295, 309, 536 N.W.2d 406 (Ct. App. 1995). Therefore, we will affirm the decision if the court examined the relevant facts, applied a proper standard of law, and reached a reasonable conclusion using a demonstrated rational process. *Magyar v. Wisconsin Health Care Liab. Ins. Plan*, 211 Wis. 2d 296, 302, 564 N.W.2d 766 (1997).

¶ 20. The circuit court first considered the probative value of the evidence and concluded that it was "probably probative." Although the court noted that Kenworth had alleged that the problems with the stationary steering and anti-braking system "may have been precipitated by overloading," it also noted that the matter would require expert testimony. Because Kenworth had not indicated that it had an expert who would be able to give an opinion to a reasonable degree of certainty that abuse caused the malfunctions, the court could not conclusively decide how probative the evidence would be.

---

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[5] Wisconsin Stat. § 802.10(7) provides: "Violations of a scheduling or pretrial order are subject to ss. 802.05, 804.12 and 805.03." Wisconsin Stat. § 805.03, in turn, provides that a court may make such orders "as are just" when a party fails to comply with a court order. This includes "prohibiting the disobedient party from introducing designated matters in evidence." *See* Wis. Stat. § 804.12(2)(a)2.

¶ 21. The court also concluded that Dobbratz would be unfairly prejudiced and it would cause undue delay to allow Kenworth to present evidence of abuse. The court found credible Dobbratz's assertion that it would have to redepose many of its witnesses because "anyone with technical knowledge about the truck and these problems . . . would have to be asked their opinions about the misuse." Because the trial was only one month away, the court concluded that redoing so much discovery would be "clearly impossible." Further, because the court did not have an opening for a civil jury trial for another fourteen months, it concluded continuing the trial was not a reasonable remedy.

¶ 22. Finally, the court noted that it was through Kenworth's own lack of diligence that it failed to assert an abuse defense earlier. Although Dobbratz had provided Kenworth in the Fall of 1999 with all the documentary evidence that Kenworth was now relying on to show that Dobbratz had abused the truck, Kenworth never informed Dobbratz during discovery that it was going to argue abuse as a defense at trial. In fact, Kenworth had stated expressly at a hearing just before it filed its "supplemental responses" that it had no evidence of abuse. Instead, Kenworth provided Dobbratz with "supplemental responses" to interrogatory requests in August 2001, several weeks after the discovery deadline had passed, that indicated Kenworth believed that Dobbratz had overloaded the truck. The circuit court concluded that Kenworth could have discovered the significance of the documents it possessed at a much earlier date.

¶ 23. Whether we analyze the circuit court's exclusion of evidence under Wis. Stat. § 904.03 or Wis. Stat. § 802.10, we conclude that the court exercised its discretion appropriately. Kenworth had access to all the

information it needed to inform Dobbratz during discovery that it would assert an abuse defense at trial and provide Dobbratz with the expert opinion upon which the defense would be based. The discovery deadline came and went, but Kenworth did not disclose this information and did not even seek to amend the scheduling order, much less show cause as to why an extension was necessary. *See* WIS. STAT. § 801.15(2)(a) (requiring that court may enlarge time only "on motion for cause shown" and that failure to act must be the result of excusable neglect if motion is made after the time has expired); *Schneller v. St. Mary's Hosp. Med. Ctr.*, 162 Wis. 2d 296, 316–17, 470 N.W.2d 873 (1991) (holding that circuit court did not abuse its discretion in excluding expert testimony when party failed to name expert by deadline in scheduling order and did not show cause for failure).

¶ 24.  Kenworth complains that it "could hardly be blamed for not realizing the significance of every entry in every document received in discovery." But all Kenworth had to do was look at the weight slips Dobbratz provided to determine whether the truck had been overloaded. Given that Kenworth is a truck manufacturer, we cannot conclude that it was unfair of the circuit court to decide that Kenworth did not act diligently when it failed to discover the evidence earlier. Therefore, it was within the circuit court's discretion to exclude expert testimony regarding the abuse issue when Kenworth had failed to disclose the expert's opinions before the deadline set in the scheduling order. *See Siker*, 225 Wis. 2d at 535; *Gerrits v. Gerrits*, 167 Wis. 2d 429, 445–46, 482 N.W.2d 134 (Ct. App. 1992).

¶ 25.  Further, as the circuit court noted, the probative value of the evidence was not certain. The uncertainty surrounding Kenworth's assertions was an

appropriate consideration in weighing the probative value of the evidence. *See* 7 DAN BLINKA, WISCONSIN PRACTICE: WISCONSIN EVIDENCE, §403.1, at 113 (2001). This is particularly true with regard to the stationary steering defect, as Kenworth conceded during its offer of proof that its overloading argument would apply "more to the ABS [anti-braking system] complaint."

¶ 26.   Kenworth challenges the circuit court's finding with respect to prejudice. Kenworth contends that Dobbratz should have conducted any discovery it needed to do over during the time between the date it filed its motion in limine in August and when the hearing was held at the end of October. But this argument ignores that the discovery deadline had already passed and Dobbratz could not perform any additional discovery unless the circuit court amended the scheduling order. It would not be reasonable to require Dobbratz to seek to amend the scheduling order or perform the discovery without permission while it had a motion pending to exclude the evidence at issue. Further, because it was Kenworth's failure to raise the abuse issue earlier that would require Dobbratz to redepose its witnesses, it was Kenworth that should have paid for the additional expense of redoing discovery. Before the hearing, however, Dobbratz would have had no idea whether Kenworth would be ordered to reimburse its expenses. Dobbratz cannot be criticized for choosing not to incur them.

■■■

¶ 27.   Finally, Kenworth argues that the circuit court should have ordered a continuance rather than exclude the evidence. We agree with Kenworth that a continuance is the preferred method for reducing prejudice caused by unfair surprise. *See Magyar*, 211 Wis. 2d at 303–04. However, the circuit court noted that it

would not be able to hold another trial for at least fourteen months. It was reasonable for the court to conclude that this was an undue delay. *See Milwaukee Rescue Mission, Inc. v. Redevelopment Authority of the City of Milwaukee*, 161 Wis. 2d 472, 493, 468 N.W.2d 663 (1991) (concluding that circuit court did not misuse its discretion in refusing to grant a continuance when case had already been pending "for almost two years" and court would not be able to reschedule the case "for over a year"). In sum, given Kenworth's lack of diligence in asserting the defense earlier, the uncertain probative value of the proffered evidence, the prejudice to Dobbratz, and the undue delay that a continuance would cause, the circuit court did not erroneously exercise its discretion in granting Dobbratz's motion in limine to exclude evidence of abuse.

### D. Discretionary Reversal

¶ 28. Finally, Kenworth requests that we exercise our power of discretionary reversal under WIS. STAT. § 752.35 and remand for a new trial. We are not persuaded that this is an "exceptional case" requiring discretionary reversal. *See Beacon Bowl, Inc. v. Wisconsin Elec. Power Co.*, 176 Wis. 2d 740, 794, 501 N.W.2d 788 (1993). A party is not entitled to a new trial whenever possibly relevant evidence is lawfully excluded.

### E. Interest on the "Amount Recovered"

¶ 29 WISCONSIN STAT. § 807.01(4) entitles a party whose settlement offer was rejected to recover twelve percent interest "on the amount recovered from the

date of the offer of settlement until the amount is paid" when the party receives a "judgment" that exceeds the settlement offer. The circuit court applied this statute because Dobbratz received a judgment that was greater than its settlement offer. However, on cross-appeal, Dobbratz challenges the court's decision to exclude its attorney's fees and costs from the "amount recovered." The interpretation of the meaning of a statutory phrase is a question of law, which we review de novo. *Nelson v. McLaughlin*, 211 Wis. 2d 487, 495, 565 N.W.2d 123 (1997).

¶ 30. Dobbratz's argument is that because the Lemon Law provides attorney's fees and costs as a "remedy" under the statute, and because these were both included in the judgment, they should also be included in the amount recovered. In concluding that Dobbratz was not entitled to prejudgment interest, the circuit court relied on *American Motorists Ins. Co. v. R & S Meats, Inc.*, 190 Wis. 2d 196, 526 N.W.2d 791 (Ct. App. 1994). In *American Motorists*, the circuit court included the double costs awarded under Wis. Stat. § 807.01(3) in the "amount recovered" under § 807.01(4). 190 Wis. 2d at 212. On appeal, the losing party argued that the amount recovered was limited "to the damages awarded" while the prevailing party argued that the phrase meant "the total amount of the judgment." *Id.* at 213. We concluded that "amount recovered" did not mean the same thing as "judgment" and therefore, interest did not run on the double costs portion of the judgment. *Id.* at 214–15.

■■■■

¶ 31. Dobbratz contends that its situation is unlike *American Motorists* because attorney fees and costs are expressly provided for by the Lemon Law. *See* Wis. Stat. § 218.015(7). We do not see the significance of that

distinction. *American Motorists* rejected a "total amount of the judgment" view of "amount recovered," which Dobbratz suggests we adopt. Although not stated explicitly in the opinion, *American Motorists* implied that it adopted an interpretation of "amount recovered" to mean damages. *Nelson* further supports this view. There, the court concluded that "amount recovered" meant "that portion of the *verdict* for which a party is responsible." *Nelson*, 211. Wis. 2d at 501 (emphasis added). These cases support a conclusion that attorney's fees and costs, regardless why they are awarded, are not part of the "amount recovered," but rather are a shifting of the costs of litigation, and separate from recovery. The circuit court did not err in excluding attorney's fees and costs from the amount recovered.[6]

*By the Court.*—Judgment affirmed.

---

[6] Dobbratz also argues that the circuit court erred in excluding evidence that Kenworth had installed the wrong steer gear boxes on the dump truck. Because we are affirming the judgment in favor of Dobbratz, we need not address this issue.