Merrimack
No. 2008-790

JOSEPH LARAMIE & a.

v.

SHAWN STONE & a.

Argued: January 13, 2010
Opinion Issued: June 30, 2010

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Charles G. Douglas, III* and *C. Kevin Leonard* on the brief, and *Mr. Douglas* orally), for the plaintiffs.

*Orville B. Fitch II*, acting attorney general (*Richard W. Head*, associate attorney general, and *Laura E. B. Lombardi*, assistant attorney general, on the brief, and *Mr. Head* orally), for the defendants.

DALIANIS, J. The defendants, Shawn Stone and Todd Connor, appeal a jury verdict awarding the plaintiffs, Joseph Laramie and Timothy Hallam,

$650,000 and $1.3 million, respectively, in compensatory damages. We affirm in part, reverse in part and remand.

The record supports the following relevant facts. The parties worked together for the department of corrections (DOC) at the New Hampshire State Prison in Concord. Laramie and Hallam were dismissed from their employment as a result of an incident on April 12, 2005, involving an inmate who had to be physically "extract[ed]" from his cell. The inmate claimed he was injured by a DOC employee who used excessive force during the extraction, and his accusations implicated the defendants.

On the day of the incident, the defendants filed written incident reports, but neither report mentioned the inmate's assault claim. Hallam also filed a report, which mentioned the alleged assault but did not state that the inmate had specifically accused the defendants. One week after the incident, each defendant filed a second report, stating that he saw Laramie assaulting the inmate during the extraction. Defendant Connor's report also stated that he told Hallam on April 12 that he saw Laramie punching the inmate. These reports led to an investigation, and Laramie and Hallam lost their jobs in July 2005.

They appealed their employment terminations to the personnel appeals board (PAB). After an evidentiary hearing, the PAB concluded that the terminations were unjust, and it reinstated Laramie and Hallam with back pay, benefits and seniority. Laramie returned to the DOC, but Hallam remained out of work on medical leave. An independent psychiatric evaluation concluded that he was permanently unable to return to work at the DOC, and he retired on medical disability.

Laramie and Hallam filed separate multi-count writs against their supervisors, the DOC, and the defendants, alleging, among other claims, intentional interference with contractual relations and invasion of privacy (false light). The suits were consolidated, and the Trial Court (*Lynn*, C.J.) granted summary judgment in favor of all parties except the defendants. Following trial, a jury returned verdicts for Laramie and Hallam, awarding them compensatory damages. On appeal, the defendants argue that the Trial Court (*Sullivan*, J.) erred by: (1) permitting Robert W. Sturke, Ph.D, Hallam's treating psychologist, to testify as an expert witness; (2) admitting the expert testimony of Arthur Kenison, Ph.D; (3) admitting evidence of the plaintiffs' reinstatement by the PAB; (4) failing to set aside the verdict based upon statements made by counsel during closing argument; and (5) failing to apply the statutory cap in RSA 541-B:14, I (Supp. 2009), which limits recovery in certain claims filed against the State or its employees to $475,000 per claimant.

*I. Expert Testimony*

The defendants raise several arguments pertaining to the trial court's management of discovery and its decisions regarding the admissibility of expert testimony. Specifically, they argue that Hallam failed to disclose Sturke as an expert properly by providing "a summary of facts and opinions to which [he] [wa]s expected to testify and a summary of the grounds for each opinion," as required by discovery rules. SUPER. CT. R. 35(f)(4). Even if Sturke was disclosed properly, they argue, he was not qualified to testify about Hallam's current or future ability to return to work. *See* N.H. R. Ev. 702. Finally, they contend that the testimony of Arthur Kenison, Ph.D, involving formulae for how to calculate Hallam's loss of earning capacity, was inadmissible.

*A. Disclosure of Sturke*

At a hearing on the defendants' motion *in limine* to exclude Sturke's testimony, the trial court noted that on the plaintiffs' expert disclosure deadline, Hallam's attorney sent a letter to the defendants' attorneys which provided:

> Under separate cover, I sent you office notes from Robert W. Sturke, Ph.D., Mr. Hallam's treating counselor. Upon my receipt, I will forward you Dr. Sturke's more recent office notes. The Plaintiff may call Dr. Sturke, Ph.D., as a witness in the trial in this case. I am enclosing a copy of his curriculum vitae. It is anticipated that Dr. Sturke will testify at trial on his treatment, clinical diagnosis, ongoing treatment routine, Mr. Hallam's inability to return to employment at the Department of Corrections, as well as his ability or inability for Mr. Hallam to return to employment given his current condition, medications and assessment.

The trial court found that this letter, coupled with Sturke's records and the defendants' opportunity to depose was "sufficient" and that the disclosure was "adequate."

When the defendants' counsel deposed Sturke, the following colloquy took place:

Q. What do you understand your role at trial to be in this case?

A. Just to report what we've talked about. That's all you can talk about.

Q. Okay. It's my understanding you haven't been retained as an expert, correct?

A. No, I'm a fact witness.

Hallam's counsel did not interject or otherwise immediately clarify that Sturke would be presenting expert testimony at trial. In addition, although a complete transcript of Sturke's deposition is not in the record, an excerpt quoted in Hallam's objection to the defendants' motion *in limine* shows that the defendants' counsel asked Sturke about the cause of Hallam's psychological problems. Specifically, he was asked:

Q. What do you believe is the cause of Mr. Hallam's psychological problem?

A. Right now?

Q. Yes.

A. Well, certainly a portion of it is related to the abuse he's experienced from his workplace. You know, being fired for — on false grounds and the subsequent financial, emotional and psychological stress that that exerts on any — would exert on anyone whose livelihood is taken away, whose career is taken away, whose healthcare is taken away for unfounded reasons.

(Emphasis omitted.) Later, when asked more specifically whether the defendants were the cause of Hallam's depression, Sturke replied, "I don't know."

■ "A party is . . . entitled to disclosure of an opposing party's experts, the substance of the facts and opinions about which they are expected to testify, and the basis of those opinions." *Figlioli v. R.J. Moreau Cos.*, 151 N.H. 618, 626 (2005). This disclosure rule applies "even when a known factual witness acts as an expert." *Wong v. Ekberg*, 148 N.H. 369, 372 (2002). "A party's failure to supply this information should result in the exclusion of expert opinion testimony unless good cause is shown to excuse the failure to disclose." *Id.* (quotation omitted); *see* SUPER. CT. R. Preface. "The policy of disclosure of expert witnesses rests upon the premise that justice is best served by a system that reduces surprise at trial by giving both parties the maximum amount of information." *Gulf Ins. Co. v. AMSCO*, 153 N.H. 28, 33 (2005) (quotation omitted). The trial court has broad discretion in the management of discovery, and its decisions will be reviewed under an unsustainable exercise of discretion standard. *In re Juvenile 2002-209*, 149 N.H. 559, 561 (2003). "To show that the trial court's decision was not sustainable, the appealing party must show that the ruling was clearly untenable or unreasonable to the prejudice of his case." *Milliken v. Dartmouth-Hitchcock Clinic*, 154 N.H. 662, 665 (2006) (quotation omitted).

■ It is the defendants' burden, as the appealing party, to submit so much of the record as is sufficient to decide the issues they raise on appeal, and to demonstrate that they raised such issues in the trial court. *See Bean v. Red Oak Prop. Mgmt.*, 151 N.H. 248, 250 (2004). The defendants have not provided us with a sufficient record on appeal to determine whether the trial court's decision to admit Sturke's testimony was clearly untenable or unreasonable to the prejudice of their case. While we find it disturbing that Hallam's counsel failed to correct Sturke's erroneous deposition statement that he was "a fact witness," we cannot determine, based upon the record provided, whether the disclosure of Sturke was consistent with the requirements of superior court rules or whether the trial court unsustainably exercised its discretion in permitting Sturke to testify as an expert.

Although the defendants' appendix includes the plaintiffs' disclosure letter, it does not include Sturke's office notes. Further, the defendants failed to provide a complete record of Sturke's deposition. We do not know what facts and opinions, if any, the notes disclosed or what other information Hallam's counsel was able to obtain from Sturke upon deposing him. Without the materials upon which the trial court determined that the disclosure was adequate, we are unable to review its decision. Thus, because the trial court retains broad discretion in the management of discovery, we cannot say upon the record before us that its exercise of discretion was unsustainable.

### B. Sturke's Qualifications

The defendants next argue that Sturke was not qualified to give an opinion on Hallam's current or future ability to return to work "because his background showed a lack of any significant expertise . . . in the relevant area of impairment to earning capacity." We disagree.

■ "Under New Hampshire Rule of Evidence 702, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto." *Milliken*, 154 N.H. at 667 (quotation omitted). In deciding whether to qualify an expert, the trial judge must conduct an adequate investigation of the expert's qualifications. *Id.* Because the trial judge has the opportunity to hear and observe the witness, the decision whether a witness qualifies as an expert is within the trial judge's discretion. *Id.*

■ Sturke has been a board-certified psychologist since 1977. He has practiced adult psychotherapy for thirty years, including evaluating and treating impaired professionals, conducting personnel assessments and treating patients for depression, anxiety and work-related stress. He participates in the State of New Hampshire's Employee Assistance Pro-

gram, through which State employees are referred to him, and he began his treatment of Hallam through this program in 2003. He has worked in a prison setting before, and he testified that this experience helped him to form his opinions about Hallam's ability to return to work at the DOC or elsewhere. Having this information before it, the trial court reasonably could have found that he was qualified to give his opinion about Hallam's current or future ability to work as a result of his psychological condition, and we cannot say that the trial court unsustainably exercised its discretion in doing so.

To the extent that the defendants raise additional arguments regarding the foundation for Sturke's testimony and the bases for his conclusions, we interpret these arguments as issues that "go to the weight to be accorded the opinion evidence, and not its admissibility." *Goudreault v. Kleeman*, 158 N.H. 236, 248 (2009) (quotations and citations omitted). "The appropriate method of testing the basis of an expert's opinion is by cross-examination of the expert." *Id.*

### C. Kenison's Testimony

Arthur Kenison, Ph.D presented formulae the jury could use to calculate what Hallam's loss of earning capacity might be. The defendants argue that the trial court erred in admitting this testimony because, to establish the proper foundation for it, Hallam was required first to present expert testimony establishing to what degree, if any, his earning capacity was impaired. Without such expert testimony, they argue, there was nothing to which the jury could suitably apply Kenison's formulae, and any damages awarded for loss of earning capacity were based upon the jury's speculation.

Expert testimony is required when the subject presented is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson. *Carbone v. Tierney*, 151 N.H. 521, 527 (2004). Expert testimony is not required when the subject presented is within the realm of common knowledge and everyday experience. *Id.* While there are certain elements of some claims for which expert testimony is always required, for most claims, it depends upon the factual circumstances. For example, we have held that expert testimony is generally required to establish proximate cause in a legal malpractice suit. *Id.*; *Estate of Sicotte v. Lubin & Meyer*, 157 N.H. 670, 674 (2008). It is also required to prove physical symptoms suffered from alleged negligent infliction of emotional distress. *Petition of Bayview Crematory*, 155 N.H. 781, 786 (2007). There are specific statutory requirements for expert testimony in medical malpractice suits. *See* RSA 507-E:2 (Supp. 2009).

By contrast, we have permitted juries to rely upon their common knowledge and everyday experience in a considerable range of circumstances. For example, expert testimony is not necessarily required to establish emotional injury from certain physically and verbally abusive conduct. *In the Matter of Gronvaldt & Gronvaldt*, 150 N.H. 551, 554 (2004). Regarding similar injury in a different context, we have stated that "[a]lthough the average juror may not have common knowledge of and everyday experience with specific searches at the State prison, it is within the ken of average lay people what mental and emotional harm might result from unprivileged physical contact of the genitals and from a strip-down search done in a slow, exaggerated and humiliating manner." *Silva v. Warden, N.H. State Prison*, 150 N.H. 372, 375 (2003) (quotation omitted). In addition, expert testimony is not always required to explain a crime victim's mental condition. *State v. Horak*, 159 N.H. 576, 583 (2010).

 Loss of earning capacity damages are "based upon the amount by which the earning capacity of the plaintiff has been reduced through the conduct of the tortfeasor." RESTATEMENT (SECOND) OF TORTS § 906(b) comment *c* at 462 (1965). "[T]he measure of damages for impairment of earning capacity is the difference between the amount which the plaintiff was capable of earning before the injury and the amount which he or she is capable of earning thereafter." 2 J. STEIN, STEIN ON PERSONAL INJURY DAMAGES § 6:5, at 6-15 (3d ed. rev. 1997); *see* 2 J. NATES ET AL., DAMAGES IN TORT ACTIONS § 10.01, at 10-3 to 10-6 (2006) (noting distinctions among claims for "future loss in earnings," "future loss of earning capacity," and "lifetime loss of earning capacity"). To warrant recovery for impairment of earning capacity, the plaintiff must show impairment of earning capacity "with reasonable certainty or reasonable probability," and must produce "evidence which will permit the jury to arrive at a pecuniary value of the loss." *Vachon v. New England Towing*, 148 N.H. 429, 433 (2002) (quotations omitted). "While proof of a permanent injury may be considered, there must be at least some evidence that the physical injury caused, or resulted in, diminished earning power." *Id.* "There is no basis for an instruction on a future impairment of earning capacity claim where there is evidence of a permanent injury, but no suggestion of how the injury would or could affect the plaintiff's power to earn money." *Id.* at 434. Thus, to provide a proper foundation for Kenison's testimony, Hallam had to present (1) evidence that his earning capacity was reduced as a result of his injury, and (2) evidence of the amount which he was capable of earning before the injury and the amount he is capable of earning thereafter. In addition, this evidence had to demonstrate impairment of earning capacity with reasonable certainty or reasonable probability and be sufficient to permit the jury to arrive at a

pecuniary value of the loss. Because the defendants argue only that Hallam was required to present *expert* testimony to meet this burden, we limit our analysis accordingly. The admission or exclusion of expert testimony is within the trial court's sound discretion. *Bronson v. The Hitchcock Clinic*, 140 N.H. 798, 806 (1996). We review the trial court's decision for an unsustainable exercise of discretion. *See id.*; *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

Though a claim for loss of earning capacity may involve a series of inferences to arrive at an estimation of damages, it does not necessarily follow that the subject itself is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson. Indeed, as a general rule, "[e]xpert testimony is admissible but usually not required to establish impairment of earning capacity." NATES ET AL., *supra* § 10.03, at 10-39 (emphasis omitted); *accord Griffin v. General Motors Corp.*, 403 N.E.2d 402, 405 (Mass. 1980) ("The assessment of damages for impairment of earning capacity rests largely on the common knowledge of the jury, sometimes with little aid from evidence."); *McIver v. Gloria*, 169 S.W.2d 710, 712 (Tex. 1943) (acknowledging that calculating the extent of impairment to one's ability to work constitutes an exercise in uncertainty and, accordingly, leaving calculation of lost earning capacity to sound discretion of jury).

Other jurisdictions subscribe to a variety of approaches regarding whether expert testimony is required to establish such damages. *See, e.g., Portis v. Wal-Mart Stores East*, No. 07-0557-WS-C, 2008 WL 2959879, at *7 (S.D. Ala. July 30, 2008) (permitting plaintiff to go forward with claim for loss of earning capacity without expert testimony from vocational rehabilitation expert); *Martin v. CSX Transportation*, 08AP-846, 2009 WL 3823364, at *3 (Ohio Ct. App. Nov. 17, 2009) (requiring expert testimony to establish a claim for lost future earnings if "injury is subjective in nature," but not if the injury itself "provides an evidentiary basis for a jury to conclude with reasonable certainty that future damages will result"); *Clayton v. Wisener*, 190 S.W.3d 685, 697-98 (Tex. App. 2005) (delegating calculation of lost earning capacity "to the sound discretion of the jury," but specifying that its decision cannot be based upon "conjecture"); *Gerver v. Benavides*, 530 S.E.2d 701, 706 (W. Va. 1999) (considering whether litigant places a specific monetary value on damages as a factor influencing whether expert testimony is required for certain claims for lost earning capacity), *cert. denied*, 529 U.S. 1131 (2000). In *Salveson v. Douglas County*, 610 N.W.2d 184, 188 (Wis. Ct. App. 2000), *aff'd*, 630 N.W.2d 182 (Wis. 2001), the court reversed a jury award for lost earning capacity because the plaintiff failed to present any evidence establishing the extent of her diminished

earning capacity. The plaintiff, who had been a county paramedic for fourteen years, was sexually harassed by her supervisor and suffered from post-traumatic stress disorder, depression and anxiety. *Id.* at 188, 189. Her treating psychologist testified that she "[wa]s and w[ould] continue to be affected by the harassment she received at work." *Id.* at 189.

Nonetheless, the court reversed the jury award for loss of earning capacity, stating, "Absent readily apparent and complete disability, . . . an award for lost earning capacity must be supported by evidence indicating the extent of impairment." *Id.* at 189. It observed that "[a]lthough [the psychologist] discussed his doubt that [the plaintiff] would be capable of normal employment for the next three years, there was no evidence indicating how or to what extent her future jobs would be affected by her psychological injuries." *Id.* at 189-90.

 Like the plaintiff in *Salveson*, Hallam's disability resulting from his injury was not "readily apparent and complete." *Id.* at 189. Similar to the psychologist's testimony in *Salveson*, Sturke's opinions regarding the projected duration of Hallam's injury and its effect on his ability to work were equivocal. Just as in *Salveson*, the record in this case contains no evidence demonstrating how or to what extent Hallam's future work opportunities would be affected by his psychological injuries. There was no information presented from which a jury could derive figures to plug into the formulae Kenison presented. Hallam has not shown impairment of earning capacity with the reasonable certainty or reasonable probability that would permit the jury to arrive at a pecuniary value of the loss. *See Vachon*, 148 N.H. at 433.

 Hallam's injury involves complex psychological and mental health conditions, the future effects of which are unknown. He suffered from similar mental health conditions before his termination, and the record indicates that he was able to work despite his condition. Determining whether Hallam's earning capacity was, in fact, impaired as a result of the injury caused by the defendants' conduct and to what degree involved more than simple mathematical calculations, *cf. Porter v. City of Manchester*, 151 N.H. 30, 46 (2004), and it was not within the jury's realm of common knowledge and everyday experience. *Accord Parra v. Atchison, Topeka & Santa Fe Ry. Co.*, 787 F.2d 507, 509 (10th Cir. 1986) ("Where the injury is obscure, . . . a loss of future earnings capacity must be established by expert medical testimony in order to avoid pure speculation on the part of the jury."). Without expert testimony, any jury award for loss of earning capacity would be based upon conjecture or speculation. STEIN, *supra* § 6:4, at 6-14 ("The law is clear that damages cannot be awarded on the speculation, passion, or guess of the jury."). We, therefore, agree with the

defendants that, under the facts of this case, it was an unsustainable exercise of discretion to admit Kenison's testimony. Accordingly, we remand for a new trial on the issue of damages for Hallam.

## II. PAB Evidence

The defendants next argue that the trial court erred in admitting evidence that the plaintiffs appealed their terminations to the PAB and prevailed in that forum. The plaintiffs contend that this issue was not properly preserved for appellate review. We agree.

It is well-settled that a contemporaneous and specific objection at trial is generally required to preserve an issue for appellate review. *Klar v. Mitoulas*, 145 N.H. 483, 488 (2000). A motion *in limine* is sufficient to preserve an issue for appeal without objection at trial if the trial court definitively rules upon the issue prior to trial. *Id.* at 488-89. A ruling on a motion *in limine* is definitive when the court is sufficiently alerted to the issue, and its written order demonstrates that it considered the issue and ruled upon it. *Id.* at 489. A trial court's decision to defer a ruling upon a motion *in limine* until trial is not a definitive ruling. *See State v. Sefton*, 125 N.H. 533, 537 (1984).

Here, the defendants filed a motion *in limine* seeking to exclude "any and all evidence relating to the [PAB] decision overturning the plaintiffs' dismissal" under New Hampshire Rules of Evidence 401, 402 and 403. In particular, they requested the following jury instruction:

> Eight months following the plaintiffs' dismissal from employment, they were reinstated to their former positions. The plaintiffs were reimbursed for any wages and benefits that were not provided during the period of time they were unemployed. The reasons for their reinstatement are not relevant to the issues in this trial, and you should not speculate about the circumstances surrounding their reinstatement.

While the record shows that the trial court considered whether and to what degree to admit evidence related to the PAB decision, it does not show that the it ruled definitively upon the defendants' motion *in limine*. At a hearing, the trial court considered the parties' arguments, but specifically stated, "I'm going to reserve ruling on this [until] trial." After further argument, including a discussion of the possibility of a stipulation to a jury instruction on the issue, the trial court reiterated, "This issue will be addressed at trial after [the warden] testifies on direct, so that it will be after his testimony on direct that we'll deal with it." It then issued a written ruling repeating the oral ruling.

In their reply brief, the defendants concede that they did not object to PAB references at trial, but argue that they did not have to because the trial court's decision to reserve ruling on their motion pertained only to the issue of whether to admit the written PAB order. They argue that to "interpret the court's oral statements and written ruling as deferring until trial a ruling on the admissibility of *all* evidence relating to the PAB proceedings defies common sense." However, they do not identify any statement by the trial court demonstrating that it was "sufficiently alerted to the issue" of the admissibility of all evidence relating to the PAB proceedings such that "its written order demonstrates that it considered the issue and ruled upon it." *Mitoulas,* 145 N.H. at 489 (quotations omitted). Moreover, the court's written order was issued upon the defendants' motion in its entirety, which sought to exclude "any and all evidence relating to the [PAB] decision overturning the plaintiffs' dismissal." Accordingly, to preserve the argument for appeal, the defendants were required to object contemporaneously and specifically at trial when evidence of the PAB decision was introduced.

The defendants urge us to review the trial court's decision to admit evidence relating to the PAB proceeding for plain error. *See* SUP. CT. R. 16-A. The plain error rule allows us to exercise our discretion to correct errors not raised in the trial court. *State v. Panarello,* 157 N.H. 204, 206 (2008). Before we may do so: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights. *Id.* If all three of these conditions are met, we may then exercise our discretion to correct a forfeited error, *only* if a fourth criterion is met: the error must seriously affect the fairness, integrity or public reputation of judicial proceedings. *Id.* We use this rule sparingly, limiting it to those circumstances in which a miscarriage of justice would otherwise result. *Id.*

Even if we were to assume that the trial court erred in admitting evidence related to the PAB proceedings and that the error was plain, we do not agree that it affected substantial rights. Thus, the third criterion is not satisfied. *See State v. Lopez,* 156 N.H. 416, 425 (2007). Generally, to satisfy the burden of demonstrating that an error affected substantial rights, the defendant must demonstrate that the error was prejudicial, *i.e.,* that it affected the outcome of the proceeding. *Id.*

The defendants argue that the error was prejudicial because its effect was to admit "[e]vidence that a separate fact finder had previously heard witness testimony and made a conclusion based on that testimony." This assertion, by itself, fails to carry their burden of proving that the error affected the outcome of the proceeding. The record reflects that the

defendants had equal opportunity to present their version of events through witness testimony, and the jury was properly instructed that it should draw its own conclusions based upon the credibility of the witnesses at trial. More specifically, the jury was instructed:

> You have heard reference in this trial that the plaintiffs appealed their termination to the Personnel Appeals [Board], or PAB, and that the plaintiffs were subsequently reinstated to their employment. You should not and cannot infer anything from the fact that the plaintiffs were reinstated. You should base your decision only on the facts before you, and the plaintiffs' reinstatement cannot be considered in your decision of whether either of these defendants are to be held liable for damages to the plaintiffs.

The defendants have raised no argument that the claimed prejudice they suffered was not addressed by this instruction. Thus, upon this record, we cannot say that any error the trial court may have made in admitting evidence of the PAB proceedings rises to the level of plain error.

### III. Closing Argument

Next, the defendants argue that the trial court erred in failing to set aside the verdict based upon statements made by the plaintiffs' counsel during closing argument. Specifically, they argue that counsel for the plaintiffs: (1) suggested to the jury that, by their verdict, they could "send a message"; and (2) "made multiple references to facts outside the trial, for the apparent purpose of associating Connor and Stone with egregious criminal acts or scandals unrelated to the facts presented at trial."

### A. "Send a message"

During closing argument, counsel for the plaintiffs explained to the jury the verdict form and the section that permitted them to award enhanced damages:

> Now New Hampshire does not have punitive damages. If we did, this would be a great case for a huge multi-million dollar punitive award. Absolutely; Send a message, pound the hell out of them. That's what punitive damages are for. When you read it in your paper, 50 million against Aetna, 10 million against State Farm for lying about someone's wind insurance, that's what juries do when they get teed off and they say, that ain't right. We've got to send a message.
>
> New Hampshire doesn't have that, but we do have enhanced damages, which mean if you don't feel you've adequately compensated on the compensatory damages side, you can enhance it.

Defendants' counsel objected to the suggestion that the jury could award damages to "send a message" and requested a curative instruction. The trial court gave the following curative instruction:

> The defense has objected to the argument that the plaintiff gave you on enhanced damages and the concept of sending a message, okay? When you get to that issue, if you're going — you know, when you — if you get to that issue, when you get to that issue, just follow my instructions. And that spells out the sole purpose of enhanced damages and where it's appropriate and why. And there is no other — that's it, right? And it's right there, it's on the next to last page. So when you get to it, just read that and follow my instructions, okay?

Defendants' counsel again objected and requested a more specific curative instruction, which the court then provided:

> Remember the comment send a message? That's punitive damage. Okay? It isn't — you can't use the enhanced damages to send a message. You can use the enhanced damages to compensate the plaintiffs if you find that there were aggravating circumstances, but not to send a message. That's for punitive damages.

The jury awarded Laramie $650,000 in compensatory damages, but no enhanced damages. The jury awarded Hallam $1.3 million in compensatory damages, but no enhanced damages.

■ As the trial court is in the best position to gauge any prejudicial effect counsel's closing remarks may have had upon the jury, we review the trial court's denial of the defendants' motion to set aside the verdict for an unsustainable exercise of discretion. *Murray v. Developmental Servs. of Sullivan County*, 149 N.H. 264, 270 (2003); *see Jackson*, 158 N.H. at 436. In assessing the effect of improper conduct by counsel, the trial court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, and the strength of the case. *Murray*, 149 N.H. at 270. We assume, without deciding, that counsel's use of the phrase "send a message" was improper. Nonetheless, we cannot say that the trial court unsustainably exercised its discretion in denying the defendants' motion.

In *Murray*, 149 N.H. at 269-70, plaintiff's counsel used the same phrase in his closing argument, though in a slightly different context. The trial court in that case sustained the defendant's objection, but then declined to

give a curative instruction. *Id.* at 270. We held that the plaintiff's argument "was improper" and that "a separate curative instruction would have been prudent," but affirmed the trial court's denial of the motion for a new trial. *Id.* Though there was no separate curative instruction, the jury in *Murray* was instructed that it should not award a "verdict . . . to punish the defendant" and that the purpose of awarding damages to the plaintiff was "not to punish the defendant for any wrongdoing, but to compensate the plaintiff for the injuries incurred as a result of the defendants' legal fault." *Id.* We concluded that these instructions were sufficient to cure any impropriety, and that the trial court's decision not to give an additional curative instruction was not clearly untenable or unreasonable to the prejudice of the defendant's case. *Id.*

██ Here, the jury was provided with written instructions about the law applicable to enhanced and compensatory damages, and it awarded the plaintiffs only compensatory damages. In addition, the defendants requested and received two curative instructions. Impropriety by plaintiffs' counsel, if any, was immediately addressed by the trial court, and we presume the jury followed the curative instructions. *State v. Lemire,* 130 N.H. 552, 555 (1988). Accordingly, the trial court did not err in failing to set aside the verdict.

## B. *References to Facts Outside of Trial*

██ ██ The defendants concede that they did not specifically object to the references to facts outside of trial or unrelated scandals until after the verdict in their post-trial motion. In their reply brief, however, they contend that "the fact that [they] did not identify every remark made by Plaintiffs' counsel in support of the improper message does not result in a waiver of their objection." This contention is incorrect. As noted above, it is well-settled that a contemporaneous and specific objection at trial is generally required to preserve an issue for appellate review. *Mitoulas,* 145 N.H. at 488. The defendants failed to object in a timely fashion to the specific remarks they claim were "references to facts outside the trial." Without each remark having been identified specifically, the trial court was unable to consider and rule upon the defendants' objections. Accordingly, we find that this issue was not preserved for our review. *See Broderick v. Watts,* 136 N.H. 153, 167 (1992) (To preserve an objection to closing arguments, "an objection should be taken at the time the alleged improper statement is made, or within a reasonable time thereafter." (quotation and ellipsis omitted)).

*IV. Statutory Cap on Damages*

Finally, the defendants argue that the trial court erred in failing to apply the statutory cap to reduce each plaintiff's jury verdict to $475,000. *See* RSA 541-B:14, I. Whether the cap applies requires us to interpret RSA chapter 541-B (2007 & Supp. 2009).

> The interpretation of a statute is a question of law, which we review *de novo*. We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meaning to the words used. When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include. If a statute is ambiguous, however, we consider legislative history to aid our analysis. Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme.

*Kleeman*, 158 N.H. at 252-53 (quotation omitted).

RSA chapter 541-B is entitled "Claims Against the State." It establishes the procedure by which individuals may seek damages from the State and/or its employees. Subject to certain specific exceptions not relevant here, all claims for damages of less than $5,000 fall under the "original and exclusive jurisdiction" of the board of claims, which has the power to "investigate, conduct hearings and make decisions, and render or deny awards" against any agency. RSA 541-B:9. The board of claims has "concurrent jurisdiction . . . with the superior court on all claims in excess of $5,000, but not exceeding $50,000, against any agency." RSA 541-B:9, III. The statute vests "original and exclusive jurisdiction of all claims in excess of $50,000 against any agency" with the superior court. RSA 541-B:9, IV. The cap provision states, in relevant part: "All claims arising out of any single incident against any agency for damages in tort actions shall be limited to an award not to exceed $475,000 per claimant." RSA 541-B:14, I.

The definition of "claim" under the chapter is broad. It includes, in relevant part, any request for monetary relief for personal injury "caused by the failure of . . . state . . . employees . . . to follow the appropriate standard of care when that duty was owed to the person making the claim, including any right of action for money damages which either expressly or by implication arises from any law." RSA 541-B:1, II-a(a). This provision could be construed as limiting the types of claims governed by the chapter

to negligence claims. Other provisions, however, suggest that the chapter also governs all intentional torts, subject to certain exceptions. *See* RSA 541-B:14, I, II; :19, I(d); *accord Opinion of the Justices*, 126 N.H. 554, 562 (1985). Because it is not clear what claims against the State and its employees are governed by RSA chapter 541-B, we find that the statute is ambiguous, and we look to legislative history to aid our analysis.

Legislative history reveals that the legislature intended this chapter to govern all claims against the State and/or its employees unless another remedy is specifically provided by statute. RSA chapter 541-B was introduced in the House of Representatives as House Bill (HB) 440, with "the intention . . . to provide a comprehensive procedure for bringing claims against the state and its employees." N.H.H.R. JOUR. 305 (1985). The committee report reiterated: "This bill establishes a procedure for those who suffer injury or property damage . . . to bring claims against the state." *Id.* at 703. When the bill was debated on the floor of the Senate, one senator stated that if the Senate did not pass the bill, "it . . . could expose the State to liability beyond [the capped amount]," further indicating an intent that the bill was to provide the sole remedy for damages claims unless otherwise specified. N.H.S. JOUR. 2210 (1985).

▮ The broad language of the statute considered as a whole, its comprehensive nature establishing procedures for filing claims with the board of claims and/or the superior court, and its legislative history support the conclusion that the legislature intended that RSA chapter 541-B govern all actions for damages against state employees unless otherwise specifically stated. We, therefore, agree with the defendants that the cap applies to the plaintiffs' jury verdict in this case.

▮ In arguing for a contrary result, the plaintiffs contend that, to determine whether RSA chapter 541-B applies, we must first determine whether the claims at issue are claims for which immunity exists under RSA 99-D:1 (2001). RSA 99-D:1, however, is simply a statement of policy adopting the common law doctrines of sovereign and official immunity. In this case, the defendants do not argue that the plaintiffs' claims are barred by RSA 99-D:1. Therefore, either RSA chapter 541-B applies and the damages are capped, or, it does not apply and the jury award stands.

▮ The purpose of RSA chapter 541-B is not *solely* to waive sovereign and official immunity as defined under RSA 99-D:1. As discussed above, the intent of the chapter is significantly broader: to establish a comprehensive and exclusive procedure for persons seeking money damages from the State and/or its employees. Indeed, the exceptions section, RSA 541-B:19, I, which no party argues applies here, corroborates this inference. Each of

the four exceptions parallels our common law rulings concerning when conduct is immune. *See, e.g., Mahan v. N.H. Dep't of Admin. Services*, 141 N.H. 747, 749 (1997) ("The[ ] exceptions [to RSA chapter 541-B] are similar to the judicially recognized exceptions to the abrogation of municipal immunity . . . ."); *Bergerson v. City of Manchester*, 140 N.H. 417, 421 (1995).

The remainder of the plaintiffs' arguments relate to whether the defendants' conduct is subject to official immunity under RSA 99-D:1. Because we conclude that the cap applies here we need not further address these arguments.

The plaintiffs also argue that, if we find that the cap applies, we must find that each plaintiff is entitled to $475,000 from each defendant. In other words, under the plaintiffs' reading of the statutory cap, it permits each plaintiff to recover total damages of up to $950,000 in this case. We disagree with this interpretation of the statute. RSA 541-B:14, I, provides that claims "arising out of any single incident . . . shall be limited to an award not to exceed $475,000 per claimant." Here, the record supports that the defendants' false reports arose out of a single incident. The harm suffered by the plaintiffs resulting from the conduct at issue was not compounded by the fact that Stone and Connor each signed a separate report. Thus, no remedial purpose would be served by applying the cap separately to each plaintiff and each defendant.

> *Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.