**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 23, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP981**

**STATE OF WISCONSIN**

Cir. Ct. No. 2015CV155

**IN COURT OF APPEALS
DISTRICT IV**

KEAGEN M. GUNDERSON AND LESLIE J. GUNDERSON,

    PLAINTIFFS-APPELLANTS-CROSS-RESPONDENTS,

STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES,

    INVOLUNTARY-PLAINTIFF,

  V.

JENNIFER L. FRANKS, HAPPY TRAILS TRANSPORT, LLC AND
ARTISAN AND TRUCKERS CASUALTY COMPANY,

    DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS,

GUNDERSEN HEALTH PLAN, INC. AND GROUP HEALTH COOPERATIVE
OF EAU CLAIRE,

    DEFENDANTS-RESPONDENTS.

APPEAL and CROSS-APPEAL from a judgment of the circuit court for Jackson County:  ANNA L. BECKER, Judge.  *Affirmed*.

Before Blanchard, Kloppenburg and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  After a vehicular accident, Leslie Gunderson and his son, Keagen Gunderson, brought a personal injury lawsuit against Jennifer Franks; her employer, Happy Trails Transport, LLC; and her employer's insurer, Artisan and Truckers Casualty Company (collectively, Franks).[1]  The case went to trial, and the jury found in part for the Gundersons and in part for Franks.  The Gundersons appeal, challenging portions of the jury's verdict and the jury instructions.  Franks cross-appeals, challenging the circuit court's monetary spoliation sanction award to the Gundersons.  For the reasons that follow, we affirm the circuit court on all of the issues presented.

## BACKGROUND

¶2    On March 4, 2014, Jennifer Franks was driving a semi-truck east on Highway 10 just outside of Fairchild, Wisconsin.  There were two vehicles in front of Franks on the highway, with Leslie Gunderson's minivan in the lead.  Leslie Gunderson (Gunderson) was driving the minivan and his son, Keagen Gunderson, was a passenger.  Just before the accident, Gunderson activated his left turn signal, slowed down, and began to turn left.  As Gunderson was turning left, Franks

---

[1] The State of Wisconsin Department of Health Services was an involuntary plaintiff below and Gundersen Health Plan, Inc., and Group Health Cooperative of Eau Claire were named defendants.  However, because these parties have not participated in this appeal, they are not referenced further.

attempted to pass both of the vehicles in front of her. As a result, Franks' semi-truck collided with the side of the Gundersons' minivan. There were at least five people at the scene of the accident: Jennifer Franks, who was driving the truck; Forrest Franks, Jennifer's husband who was in the truck's sleeper cabin[2]; Leslie and Keagen Gunderson; and Cory Treffert, who was driving the car that was between Franks and the Gundersons immediately before the accident.

¶3 The Gundersons subsequently filed this action, seeking damages for personal injuries and loss of society and companionship as a result of the accident. Before trial, Franks stipulated to sole causal negligence for the accident, leaving the amount of damages as the only issue. As to damages, the parties disputed both the cause and extent of Leslie Gunderson's alleged injuries.

¶4 At trial, the defense presented testimony and evidence showing that, before the accident, Gunderson had an extensive history of serious medical problems, many of which were identical or similar to the issues that he claimed were the result of the accident. This evidence included that Gunderson had been in two previous serious accidents: in 1995 he was in a hunting accident, and in 2010 he was in a motor vehicle accident. Following these accidents, Gunderson received a significant amount of medical care, evidence of which was introduced at trial.

¶5 During the course of the seven-day trial, the parties introduced voluminous medical records, reports, and other exhibits, and the testimony of nearly a dozen expert witnesses. Non-expert witnesses included the Gundersons, Jennifer Franks, and Treffert.

---

[2] Forrest Franks was also employed as a driver of the truck involved in the accident, but was not driving on the day of the accident.

¶6      Relevant to this appeal, the jury awarded Gunderson a total of $153,000, itemized on the special verdict form as follows: $105,000 for past medical and health care expenses; $7,000 for future medical and health care expenses; $21,000 for past loss of earning capacity; and $20,000 for past pain, suffering, and disability. The jury awarded Gunderson $0 for future loss of earning capacity; $0 for future pain, suffering, and disability; and $0 for loss of society and companionship of his son, Keagen Gunderson.

¶7      The Gundersons filed a motion after the verdict. Pertinent to this appeal, they argued that, as to Leslie Gunderson: (1) the jury's verdict awarding $7,000 for future medical and health care expenses was inconsistent with its verdict awarding nothing for future pain and suffering; (2) the circuit court erred in not giving a requested special jury instruction on the collateral source rule; and (3) there was insufficient evidence to support the jury's verdict awarding nothing for loss of future earnings. The Gundersons requested that the circuit court change answers to the verdict, grant additur, or grant a new trial. The circuit court denied the Gundersons' motion in all respects. The Gundersons now appeal with respect to these issues, and Franks cross-appeals, arguing that the circuit court erred in awarding spoliation sanctions.[3] We address the parties' arguments below, setting out additional facts as pertinent to our discussion.

_____

[3] While both Leslie and Keagen Gunderson filed notices of appeal, Franks argues that the Gundersons' brief presents arguments on behalf of only Leslie and therefore we should deem Keagen's appeal abandoned. *See* **A.O. Smith Corp. v. Allstate Ins. Cos.**, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised on appeal, but not briefed or argued, is deemed abandoned."). The Gundersons do not respond to this argument in their reply brief. Therefore, we take it as conceded that Keagen Gunderson's appeal has been abandoned and we need only discuss those facts and issues that relate to Leslie Gunderson. *See* **Fischer v. Wisconsin Patients Comp. Fund**, 2002 WI App 192, ¶1 n.1, 256 Wis. 2d 848, 650 N.W.2d 75 ("An argument asserted by a respondent on appeal and not disputed by the appellant in the reply brief is taken as admitted."). As a result, the remainder of this opinion will discuss only Leslie Gunderson (referred to as Gunderson).

**DISCUSSION**

*I. Inconsistent Verdicts*

¶8      Gunderson argues that the jury's verdicts on future medical expenses (awarding him $7,000) and future pain and suffering (awarding him $0) were inconsistent.  "An inconsistent verdict is a term of art used in describing jury answers which are logically repugnant to one another." *Fondell v. Lucky Stores, Inc.*, 85 Wis. 2d 220, 228, 270 N.W.2d 205 (1978).  "Inconsistency exists when answers cannot be reconciled or cannot be reconciled without eliminating or altering an answer." *Reuben v. Koppen*, 2010 WI App 63, ¶13, 324 Wis. 2d 758, 784 N.W.2d 703.  On appeal, we uphold jury verdicts against inconsistency challenges "when the record is such that the jury could have made both of the findings that are claimed to be inconsistent." *Sharp v. Case Corp.*, 227 Wis. 2d 1, 20, 595 N.W.2d 380 (1999).  "It is well established that an appellate court will not overturn a jury's verdict if there is any credible evidence to support it."  *Staehler v. Beuthin*, 206 Wis. 2d 610, 622, 557 N.W.2d 487 (Ct. App. 1996).

¶9      In support of his inconsistency argument, Gunderson notes that several of his expert witnesses testified that a large part of his future medical care would consist of pain treatment.  As a result, he asserts, the jury's refusal to award damages for future pain and suffering was "logically repugnant" to its award for future medical expenses.  We disagree.

¶10      We begin our analysis with *Staehler*, which parallels the instant case in several respects.  In *Staehler*, the plaintiff was injured in an automobile accident and the jury returned a monetary award for medical expenses, but nothing for pain and suffering. *Id.* at 615-16.  The plaintiff appealed the verdicts as inconsistent, and this court held that "[a] verdict is not inconsistent because it allows damages for

medical expenses but denies recovery for personal injuries or pain and suffering." *Id.* at 623. We noted in *Staehler* that there was a "significant jury question as to whether [the plaintiff's] claims legitimately related to [the] accident or were the product of prior medical problems, fabrication or exaggeration." *Id.* at 622-23. Similarly, here, there was ample evidence indicating that Gunderson's prior injuries might account for any possible future pain and suffering. In addition, the jury heard expert testimony that injuries from the 2014 accident at issue in this case were only temporary and would have resolved before the trial began.

¶11 On appeal, Gunderson argues that *Staehler* is distinguishable because the issue of pain and suffering in that case "boiled down to the jury's assessment of [the plaintiff's] credibility," *id.* at 623, whereas Gunderson presented expert testimony from physicians. However, juries are charged with the duty of assessing the credibility of lay and expert witnesses alike. *See Tony Spychalla Farms, Inc. v. Hopkins Agric. Chem. Co.*, 151 Wis. 2d 431, 441, 444 N.W.2d 743 (Ct. App. 1989) ("The credibility, sufficiency and weight of expert evidence are for the fact finder to determine."). Also, not only was much of the relevant expert testimony presented by Gunderson's experts contradicted by other expert testimony, but our case law further establishes that "even if [an expert's] opinion was uncontradicted[] [a] trier of fact has the right to accept as much or as little of an expert's opinion as it finds probative." *See State v. Wenk*, 2001 WI App 268, ¶9, 248 Wis. 2d 714, 637 N.W.2d 417 (citation omitted). Here, the jury could have credited aspects of some testimony on the issue of medical expenses but credited different aspects of other testimony on the issue of pain and suffering. Based on the evidence presented, we conclude that "the jury could have made both of the findings that are claimed to be inconsistent." *See Sharp*, 227 Wis. 2d at 20. Therefore, the circuit court properly denied Gunderson's post-verdict motion.

6

## II. Collateral Source Rule Instruction

¶12    Gunderson argues that the circuit court erroneously declined to instruct the jury on the collateral source rule.  This rule provides that "benefits an injured person receives from sources that have nothing to do with the tortfeasor may not be used to reduce the tortfeasor's liability to the injured person." *Leitinger v. Dbart, Inc.*, 2007 WI 84, ¶26, 302 Wis. 2d 110, 736 N.W.2d 1.  As our supreme court has explained:

> "[T]he tortfeasor who is legally responsible for causing injury is not relieved of his obligation to the victim simply because the victim had the foresight to arrange, or good fortune to receive, benefits from a collateral source for injuries and expenses."  Accordingly, an award of damages cannot be limited to or reduced by a collateral source payment.

*Id.*, ¶28 (footnote and quoted source omitted).

¶13    Although circuit courts have broad discretion over tailoring jury instructions, whether a particular instruction should have been given at all is an issue that we review de novo.  *See Farrell v. John Deere Co.*, 151 Wis. 2d 45, 60, 443 N.W.2d 50 (Ct. App. 1989).  It is error for a court to refuse to instruct the jury on an issue *raised* by the evidence; it is also error to give an instruction on an issue *not raised* by the evidence.  *See D.L. v. Huebner*, 110 Wis. 2d 581, 624, 329 N.W.2d 890 (1983).  When determining whether an issue was supported by the evidence, courts view the evidence in the light most favorable to the party requesting the instruction.  *See Couillard v. Van Ess*, 141 Wis. 2d 459, 463-64, 415 N.W.2d 554 (Ct. App. 1987).

¶14    Gunderson argues that the collateral source rule was at issue because the jury heard evidence about "possible Social Security payments" to Gunderson.

Specifically, Gunderson points to several points in the trial at which counsel and witnesses mentioned questions that Gunderson posed, before the accident in this case, to his healthcare providers about possibly going on disability.

¶15    We conclude that the circuit court properly denied Gunderson's request for a collateral source rule instruction. Notably, the jury heard no evidence that Gunderson had already received or would later receive social security disability payments. References to his *inquiries* about *possibly* "going on" disability are too tenuous of a connection to put collateral payments at issue.[4] As a result, Gunderson has not shown that he was entitled to an instruction on the collateral source doctrine.

*III. Inadequate Award for Loss of Future Earnings*

¶16    Gunderson's final argument is that the jury's verdict awarding him no damages for loss of future earnings was not supported by credible evidence. He asks this court to vacate the jury's verdict and grant him the option of a new trial or additur. *See **Powers v. Allstate Ins. Co.**, 10 Wis. 2d 78, 91-92, 102 N.W.2d 393 (1960) (adopting what has become known as the "**Powers** rule," which allows a court to set aside inadequate damages and offer plaintiff option of additur or a new trial on the issue of damages); see generally **Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.**, 206 Wis. 2d 158, 190-93, 557 N.W.2d 67 (1996) (discussing **Powers** rule).

¶17    "Our standard of review of a jury's verdict is severely circumscribed. We must affirm the jury's verdict 'if there is any credible evidence to support [it].'"

---

[4] Furthermore, Gunderson's ability to work prior to the 2014 accident at issue here was relevant to the issues at trial. *See **Salveson v. Douglas Cty.**, 2000 WI App 80, ¶6, 234 Wis. 2d 413, 610 N.W.2d 184 ("[d]amages for impaired earning capacity are arrived at by comparing what the plaintiff was capable of earning before and after the time of the injury.").

*Staehler*, 206 Wis. 2d at 617 (quoted source omitted). "When the verdict has the trial court's approval, this is even more true." *Id.* An appellate court's task "is not to search the record for evidence contrary to the jury's verdict." *Id.* Instead, "we must search the record for credible evidence in support of the verdict, accepting any reasonable inferences favorable to the verdict that the jury could have drawn from that evidence." *Id.* "[T]he credibility of witnesses and the weight given to their testimony is for the judgment of the jury, not an appellate court." *Hoffmann v. Wisconsin Elec. Power Co.*, 2003 WI 64, ¶9, 262 Wis. 2d 264, 664 N.W.2d 55.

¶18 In support of his argument, Gunderson points to testimony from his treating physicians indicating that he is permanently disabled and unable to be competitively employed as a result of the 2014 accident. He then asserts that the only evidence supporting a finding of no loss of future earnings came from Franks' vocational expert, Jay Smith, and that Smith's testimony was not credible. As a result, Gunderson asserts, there was insufficient evidence to support the jury's verdict awarding no damages for future loss of earnings.

¶19 Gunderson's argument is not persuasive. First, as we have already noted, "even if [an expert's] opinion was uncontradicted[] [a] trier of fact has the right to accept as much or as little of an expert's opinion as it finds probative." *See Wenk*, 248 Wis. 2d 714, ¶9 (citation omitted). Thus, the jury was not bound to accept, credit, or weigh the testimony of any expert witness in Gunderson's favor.

¶20 More significantly, Gunderson's argument fails because he mischaracterizes the evidence. Specifically, Gunderson asserts that Smith's testimony was the only evidence that Gunderson had no lost earning capacity, but that is not accurate. Without attempting to review all of the evidence in detail here, there was ample evidence presented to the jury from other sources which

contradicted that of Gunderson's treating physicians with respect to the cause and extent of Gunderson's injuries in terms of his ability to work after the 2014 accident.

¶21 As previously discussed, the jury heard evidence that Gunderson had extensive preexisting injuries and medical problems that predated the 2014 accident that is at issue in this case. These prior injuries necessitated significant medical treatment, as testified to by multiple medical providers, including Gunderson's own physicians. Dozens of exhibits were admitted during trial showing that, prior to the 2014 accident, Gunderson required X-rays, MRI scans, injections, and prescription medications. Evidence was presented that Gunderson had a pain contract with his treating physician for narcotic medications that began just two months prior to the 2014 accident. One of Gunderson's treating physicians testified that Gunderson had a severe disability two to three years prior to the 2014 accident, and that, in his view, Gunderson's first motor vehicle accident, in 2010, should have resulted in Gunderson being placed on permanent light-duty work restrictions. Evidence was also presented that Gunderson was seriously considering going on disability in 2013, before the 2014 accident. Two physicians testified that Gunderson sustained no permanent injury as a result of the 2014 accident and that his injuries likely resolved within a few months of the accident. From the evidence presented, the jury could have reasonably concluded that the 2014 accident did not affect Gunderson's ability to work. As the circuit court stated in denying Gunderson's post-verdict motion: "[W]hen we talk about medical expenses, future medical expenses, and pain and suffering I believe that there was credible evidence to suggest that any of those things could've been attributable to that prior set of injuries ...."

¶22 Finally, the jury heard evidence that Gunderson did not undergo any functional capacity testing following the 2014 accident to determine whether he was capable of working and at what level. As the circuit court observed in discussing

this lack of testing: "[T]he jury may very well have said we don't have enough information to award [loss of future earnings], and that's how they came up with zero."

¶23 In sum, the voluminous evidence in this case cut both ways on the future earnings issue and some of it credibly supported the jury's verdict. It is not for this court to reweigh the evidence in Gunderson's favor. *See **Hoffmann***, 262 Wis. 2d 264, ¶9.

## *IV. Spoliation Sanctions*

¶24 In Franks' cross-appeal, Franks contends that the circuit court erroneously sanctioned Franks for her failure to preserve data from the electronic control module (ECM) in her truck. We disagree.

¶25 Commonly known as a "black box," ECMs are devices that record data about the activities of vehicles in which they are installed. Pertinent here, Franks' truck was equipped with a black box that preserved data snapshots of the moments surrounding sudden decreases in the truck's speed. Gunderson's expert on black box data referred to these sudden decreases in speed as "hard braking" events.

¶26 Immediately following the crash in this case, the truck was taken in for repairs at a shop that could have quickly and easily downloaded the applicable black box data. However, Franks never requested such a download, and the black box was not accessed until more than three years after the crash. By that time, the accident data had long since been overwritten by subsequent hard braking events.

¶27     Because the data was not preserved, Gunderson moved for spoliation sanctions.[5]  The circuit court concluded that sanctions were appropriate and gave an adverse inference instruction to the jury as well as a $3,852.50 monetary award to Gunderson.   Franks concedes that the adverse inference jury instruction was harmless, but Franks cross-appeals the monetary award.

¶28     The circuit court based its ruling on the following five-factor test for analyzing requests for spoliation sanctions:

> "(i) identification, with as much specificity as possible, of the documents which were destroyed; (ii) the relationship of those documents to the issues in the present action; (iii) the extent to which such documents can now be obtained from other sources; (iv) whether [the party responsible for the document destruction] knew or should have known at the time it caused the destruction of the documents that litigation against [the opposing parties] ... was a distinct possibility, and (v) whether, in light of the circumstances disclosed by the factual inquiry, sanctions should be imposed upon [the party responsible for the document destruction] and, if so, what the sanctions should be."

*Milwaukee Constructors II v. Milwaukee Metro. Sewerage Dist.*, 177 Wis. 2d 523, 532, 502 N.W.2d 881 (Ct. App. 1993) (bracketed material in original; quoted source omitted).

¶29     This court reviews a decision to impose sanctions for spoliation under the erroneous exercise of discretion standard.  *See American Family Mut. Ins. Co. v. Golke*, 2009 WI 81, ¶18, 319 Wis. 2d 397, 768 N.W.2d 729.  This court will affirm the circuit court if it "has examined the relevant facts, applied a proper standard of law, and, utilizing a demonstratively rational process, reached a

---

[5] Spoliation is "'the destruction or withholding of critically probative evidence resulting in prejudice to the opposing party.'" *Estate of Neumann v. Neumann*, 2001 WI App 61, ¶79, 242 Wis. 2d 205, 626 N.W.2d 821 (quoted source omitted).

conclusion that a reasonable judge could reach." *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 717, 599 N.W.2d 411 (Ct. App. 1999).

¶30     In its oral ruling on the spoliation issue, the circuit court made factual findings and applied the *Milwaukee Constructors II* factors to those findings. Franks does not argue that the circuit court misidentified the legal standard or that the court's factual findings were unsupported by the evidence.   Rather, Franks appears to contend that the court misapplied or misunderstood the factors in various ways.   Below, we address each of the factors and explain why we conclude that the circuit court did not erroneously exercise its discretion when it awarded spoliation sanctions.

### A.  Identification of the Destroyed Evidence

¶31     The first *Milwaukee Constructors II* factor is the "identification, with as much specificity as possible, of the documents which were destroyed." *Milwaukee Constructors II*, 177 Wis. 2d at 532 (quoted source and internal quotation marks omitted).  The circuit court identified the destroyed evidence as the black box data.  Franks does not challenge the court's finding with respect to this factor.

### B.  Relationship of the Destroyed Evidence to the Action

¶32     The second factor is "the relationship of those documents to the issues in the present action." *Id.*  The circuit court concluded that the black box speed-on-impact data was relevant to determining the extent of the injuries sustained by Gunderson, and by extension, to the amount of damages that he should have been awarded.  Franks argues that the speed-on-impact data was not relevant because

there was no expert testimony about the effect of the truck's speed on Gunderson's injuries.

¶33 Franks' argument is not persuasive. We conclude that, if the speed-on-impact data had been preserved, it would have been relevant to determining the extent of Gunderson's injuries. In reaching this conclusion, we assume without deciding that Gunderson would have needed an expert witness to explain the importance of the speed-on-impact data. However, we reject Franks' contention that the absence of an expert witness at the spoliation stage should affect our analysis. There was no need for an expert witness precisely because the data was destroyed in the first place. Gunderson can hardly be faulted for failing to call an expert to testify about nonexistent data.

### C. Other Sources of the Destroyed Evidence

¶34 The third factor is "the extent to which [the evidence] can now be obtained from other sources." *Id.* Franks argues that the third factor weighs against awarding spoliation sanctions because Gunderson could obtain the speed-on-impact evidence from "other sources." Specifically, Franks notes that the Gundersons, Franks, and an independent eyewitness (Treffert) could all give their opinions about the truck's speed-on-impact.

¶35 The circuit court reasonably concluded otherwise. The court found that eyewitness testimony from a lay person who is untrained in assessing vehicle speed was not a substitute for the black box speed-on-impact data. We discern no error in this reasoning. Although competent lay witnesses may testify as to their opinions about a vehicle's speed, Franks does not show that the circuit court incorrectly concluded that such testimony is generally not comparable to "data evidence" from a black box.

14

¶36  To the contrary, the soundness of the circuit court's conclusion is supported by the testimony on this issue during trial. Franks' and Treffert's testimony conflicted on the issue of speed-on-impact. Franks testified that the speed-on-impact was between 35 to 40 miles per hour. Treffert testified that his "best estimate" of the truck's speed-on-impact was 55 miles per hour, but that he "couldn't gauge it totally." For Franks to argue that this conflicting testimony could substitute for the black box data is meritless.

### D. Reasonable Anticipation of Litigation

¶37  The fourth factor is "whether [the party responsible for the document destruction] knew or should have known at the time it caused the destruction of the documents that litigation against [the opposing parties] ... was a distinct possibility." *Id.* Franks contends that this factor weighs against spoliation sanctions because (1) Franks did not "intentionally" destroy the black box data; (2) Franks did not receive explicit notice from the plaintiffs that litigation was imminent until after the data was likely already overwritten; (3) contemporaneous federal regulations did not require Franks to preserve the black box data; and (4) Jennifer Franks testified that she was unaware of the need to preserve the black box data. The circuit court did not find Franks' arguments persuasive, concluding that "[the parties] should've known [to preserve the black box data] ... the nature of the accident itself should've given the parties pause to be concerned."

¶38  Franks has not shown that the circuit court's conclusion constituted an erroneous exercise of discretion. Franks attempts to argue around the edges of the fourth factor's standard, but cannot overcome this obvious fact: when a commercial semi-truck broadsides a passenger vehicle at high speed, all parties

15

involved know or should know that litigation is, at least, a "distinct possibility." *See id.*

## E. Remaining Circumstances

¶39 The fifth and final factor is "whether, in light of the circumstances disclosed by the factual inquiry, sanctions should be imposed upon [the party responsible for the document destruction] and, if so, what the sanctions should be." *Id.* When discussing this factor, the circuit court correctly stated that one of the purposes of the spoliation doctrine is to "deter parties from destroying evidence." *See Insurance Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI App 15, ¶16, 269 Wis. 2d 286, 674 N.W.2d 886 (2003). In this case, it was undisputed that Franks took no action to either preserve or destroy the black box data—the question with regard to intent was whether Franks' inaction evidenced an intention to destroy the evidence by omission.

¶40 Franks argues that there was insufficient proof of any intentional conduct with respect to destruction of the black box data. The circuit court made a finding to the contrary. The court referenced facts from a deposition of Gunderson's black box data expert. In that deposition, the expert implied that some of the still-preserved longitudinal data following the 2014 accident evidenced poor driving habits.[6] The expert stated that the black box data contained more "hard braking" events than he had ever seen; in fact, he had never seen anything "even close to that." He also noted that the truck had reached a peak speed of 94.5 miles per hour.

---

[6] As referenced in footnote 2, Forrest Franks was also employed as a driver of the truck, although he did not drive on the day of the accident. Presumably his driving data would have also been captured on the ECM.

¶41    With respect to Franks' intent, the circuit court concluded that her failure to take appropriate action was to prevent "any evidence that can be used against [Franks]" and that the conduct was "done with the hopes that there's going to be some loss of data here." The court concluded that, although Franks "certainly didn't make an intentional act of erasing it," Franks "intended that it not be preserved by intentionally not downloading it." The court found that the expert's opinion cut against Franks' credibility with respect to the failure to preserve the black box data:

> I think that [the poor driving data] goes to credibility, intention; maybe if we don't have the [data] we won't be able to establish that we had this significant event. And I think that does cut against the drivers of the commercial motor vehicle in terms of what their thought process may have been and whether this was done without care, in other words, negligently or carelessly—"I never thought of it"; or whether it was more along the lines of, "Now we won't have any evidence because we're not going to download it right now." I think it's quite suspect when you have those significant—what sounds like poor driving behavior and then you not preserve [the black box data] when this is what you do to earn your bread and butter on a daily basis.

¶42    Franks argues that the circuit court's consideration of the black box data in fashioning spoliation sanctions was erroneous for two reasons. First, Franks argues that the circuit court punished Franks for assumed bad driving behavior rather than for failing to preserve evidence. Second, Franks contends that consideration of the black box data to assess Jennifer Franks' credibility was an error of law. We disagree on both counts.

¶43    First, we see no evidence in the record that the circuit court punished Franks for bad driving behavior. Rather, the record establishes that the court considered the black box data as probative of Franks' credibility with respect to the reasons for the lost data.

17

¶44    Second, we discern no error in the circuit court's use of Franks' "poor driving behavior" to assess Jennifer Franks' credibility. While poor driving behavior may not generally bear on credibility, when a fact at issue is whether a party deliberately failed to preserve evidence of that party's own bad driving, the connection is reasonably clear. The circuit court was well within its discretion to evaluate Jennifer Franks' claimed ignorance of the duty to preserve the black box data against the backdrop of what the remaining black box data showed.

¶45    In sum, Franks has failed to demonstrate that the circuit court erroneously exercised its discretion in imposing monetary sanctions for spoliation of evidence.

## CONCLUSION

¶46    For the reasons stated above, we affirm the circuit court.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.